**Marilyn JEDWAB, Plaintiff,**

v.

**MGM GRAND HOTELS, INC., Tracinda Corporation, Kirk Kerkorian, James D. Aljian, Alvin Benedict, Fred Benninger, Barrie K. Brunet, Cary Grant, Peter M. Kennedy, Frank E. Rosenfelt, Bernard J. Rothkopf, Walter M. Sharp, Robert Van Buren, Bally Manufacturing Corporation, and Bally Manufacturing Corporation International, Defendants.**

Court of Chancery of Delaware,
New Castle County.
Submitted: March 31, 1986.
Decided: April 11, 1986.

William Prickett and Michael J. Hanrahan or Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, and Ronald Litowitz of Bernstein, Litowitz, Berger & Grossman, New York City, for plaintiff.

Henry N. Herndon, Jr., Esquire, Edward M. McNally, Esquire, and Mary M. Johnston, Esquire, of Morris, James, Hitchens and Williams, Wilmington, and Christina A. Snyder, Esquire, of Wyman, Bautzer, Rothman, Kuchel & Silbert, California, Attorneys for defendants MGM Grand Hotels, Inc., James D. Aljian, Barrie K. Brunet, Cary Grant, Frank E. Rosenfelt, Bernard J. Rothkopf and Walter M. Sharp.

Robert K. Payson, Donald J. Wolfe, Jr., and John E. James of Potter, Anderson & Corroon, Wilmington, for defendants Alvin Benedict, Peter M. Kennedy and Robert Van Buren.

Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, for defendant Fred Benninger.

Stephen J. Rothschild of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for defendants Bally Mfg. Corp. and Bally Mfg. Corp. Inter.

## OPINION

ALLEN, Chancellor.

MGM Grand Hotels, Inc., a Delaware corporation ("MGM Grand" or the "Company") that owns and operates resort hotels and gaming establishments in Las Vegas

and Reno, Nevada, has entered into an agreement with Bally Manufacturing Corporation, also a Delaware corporation, ("Bally") contemplating a merger between a Bally subsidiary and the Company. On the effectuation of such merger, all classes of the Company's presently outstanding stock will be converted into the right to receive cash.

Defendant Kerkorian individually and through Tracinda Corporation, which he wholly owns, beneficially owns 69% of MGM Grand's issued and outstanding common stock and 74% of its only other class of stock, its Series A Redeemable Preferred Stock (the "preferred stock" or simply the "preferred"). Mr. Kerkorian took an active part in negotiating the proposed merger with Bally and agreed with Bally to vote his stock in favor of the merger. Since neither the merger agreement nor the Company's charter contains a provision conditioning such a transaction on receipt of approval by a greater than majority vote, Mr. Kerkorian's agreement to vote in favor of the merger assured its approval.

Neither Kerkorian nor any director or officer of MGM Grand is affiliated with Bally either as an owner of its stock, or as an officer or director. Nor, so far as the record discloses, has any such person had a business or social relationship with Bally or any director, officer or controlling person of Bally. Bally—at least prior to its obtaining an option on Kerkorian's shares as part of the negotiation of the agreement of merger—has owned no stock in MGM Grand.

Plaintiff is an owner of the Company's preferred stock. She brings this action as a class action on behalf of all owners of such stock other than Kerkorian and Tracinda and seeks to enjoin preliminarily and permanently the effectuation of the proposed merger. The gist of the theory urged as justifying the relief sought is that the effectuation of the proposed merger would constitute a breach of a duty to deal fairly with the preferred shareholders owed to such shareholders by Kerkorian,

as a controlling shareholder of MGM Grand, and by the directors of the Company. The merger is said to constitute a wrong to the preferred shareholders principally in that it allegedly contemplates an unfair apportionment among the Company's shareholders of the total consideration to be paid by Bally upon effectuation of the merger. Pending is plaintiff's motion for a preliminary injunction.

## I.

Recitation of the relevant facts, as they appear at this preliminary stage, may helpfully be divided into two parts: the facts relating to the 1982 creation of the preferred stock on whose behalf this action is prosecuted and the more current events that have lead to the proposed Bally merger, including the terms of that proposed transaction. Under plaintiff's theory, the circumstances surrounding the 1982 creation of the preferred stock are significant because those circumstances help to demonstrate the essential equivalence of the preferred and the common stock.

### A. *The Creation of the Preferred Stock*

MGM Grand, through wholly-owned subsidiaries, owns and operates the MGM Grand Hotel-Las Vegas and the MGM Grand Hotel-Reno. Prior to May 30, 1980, the Company had been called Metro-Goldwyn-Mayer, Inc., and included both the present hotel business and a film production business now conducted through unrelated corporations.

The Company entered the hotel business in December, 1973, with the opening of its Las Vegas facility. That luxury hotel and casino now consists of some 2,800 guest rooms and a 62,500 square foot casino. In addition, tennis courts, swimming pools, restaurants, meeting rooms, shops and other facilities associated with a resort hotel are located on the hotel's 44-acre site. The Las Vegas hotel was very profitable from the outset and in May, 1978, the Company opened its Reno hotel which was constructed on a similarly large scale.

In November, 1980, tragedy struck at the MGM Grand Hotel-Las Vegas. That night a fire consumed the 25-story hotel and 84 lives were lost. The fire required the closing of the Las Vegas hotel for over 8 months and required almost total renovation of that facility. It gave rise as well to protracted litigation relating both to the personal injuries sustained in the fire and the loss of property by the Company. Hundreds of suits were brought against the Company seeking, in total, more than $650 million in compensatory damages and more than $2 billion in punitive damages. In addition, the Company was required to sue its property insurance carriers seeking recovery of losses occasioned by the fire.

Following the Las Vegas disaster there was a significant fall-off in the market value of MGM Grand's common stock. Closing the week of November 14, 1980, at 13¼, the price of the Company's common stock closed at 10 the following week and closed the week of December 12 at 7½.

Apparently in response to the reduced price of the Company's stock and to the risks to stockholders' investment represented by the fire-related litigation claims, on April 1, 1982, the Company publicly offered to exchange one share of common stock for one share of a new class of stock, the Series A Redeemable Preferred Stock. The offer extended to a maximum of 10 million shares of the Company's then outstanding 32,500,000 shares. The offering document stated that Mr. Kerkorian (who at that time controlled very slightly in excess of 50% of the issued and outstanding common stock) would tender into the offer that number of shares equal to the total numbered tendered by all other shareholders, but in no event would he tender less than 5 million shares.

The preferred stock issued in connection with the 1982 exchange offer carries a cumulative $.44 annual dividend (the same dividend paid with respect to the common stock both at the time of the exchange offer and now), is non-convertible, elects no directors unless dividends remain unpaid for six quarters, has a liquidation preference of $20 per share and carries a complex redemption right.

The redemption provisions require the Company to acquire each year a number of preferred shares determined by a formula set forth in the certificate designating the rights, preferences, etc. of the preferred. The Company, however, is required to redeem stock at $20 per share in any year only if it is unable privately to purchase, on the market or through a tender offer, the number of preferred shares required to be "redeemed" that year. In fact, during fiscal years 1982–84 the Company purchased a total of 766,551 shares of preferred stock on the open market at an average cost of $7.92 per share and has been required to redeem no shares at $20 per share.

The offering document explained the reasons for the exchange offer as follows:

Prior to the announcement of the Exchange Offer, in management's opinion the earnings and possible future performance of MGM Grand were not being adequately reflected in the market price of the Common Stock. Accordingly, management decided that present stockholders should be given an opportunity to liquidate all or a portion of their Common Stock holdings in exchange for Preferred Stock. Assuming continued earnings of MGM Grand which are available for redemption of Preferred Stock, stockholders accepting the Exchange Offer who hold their Preferred Stock until their shares are called for redemption will receive $20 per share, without regard to future market fluctuations in the Common Stock. To the extent that MGM Grand has only minimal future net profits or has net losses, redemptions of Preferred Stock could extend over a significant number of years.... MGM Grand presently intends to satisfy its redemption obligations to the extent possible by acquiring Preferred Stock in the open market or otherwise so long as such stock can be acquired at a price of less than $20 per share. Accordingly, no as-

surance can be given as to whether any significant number of shares of Preferred Stock will ultimately be redeemed at the $20 per share redemption price.

With respect to the effect of the exchange on the rights of persons accepting the offer, the offering document stated in part:

An exchange of Common Stock will result in the holder receiving a security which MGM Grand must redeem (as net profits become available ...) at a price substantially above the market price for MGM Grand's Common Stock prior to the announcement of the Exchange Offer.... Since the rate of redemption depends upon several factors, including MGM Grand's future net profits and dividend levels on the Common Stock (increased dividend levels will result in a slower rate of redemption, while decreased dividends will result in a faster rate), exchanging stockholders will have no assurance as to when their Preferred Stock will be redeemed, and such holders will receive no income other than annual dividends of $.44 per share (payable $.11 a quarter when and as declared by the Board of Directors) for the time the Preferred Stock is held.... Furthermore, all or a portion of the Preferred Stock to be redeemed may be acquired through open market or other purchases by MGM Grand at prices which are substantially less than $20 per share.

MGM Grand's Board of Directors will continue to exercise the discretion it is granted by law in the management of MGM Grand, and MGM Grand is under no obligation to adhere to or adopt policies which might maximize short-term income and the rate of redemption of the Preferred Stock at the expense of MGM Grand's long range best interests.

Through the exchange offer, 9,315,403 common shares were exchanged, including 5 million shares by Mr. Kerkorian and his corporation, Tracinda.[1]

B. *Negotiation of the Proposed Merger*

On June 6, 1985, Tracinda and Kerkorian announced an intention to pursue a cash-out merger transaction that would eliminate the public common stockholders from the Company at $18 per share, but would leave the preferred stock in place. In response, the board of the Company created a special committee to review and evaluate such a proposal. The committee retained legal counsel and hired Bear Stearns & Co., Inc., to act as its financial advisor. While events mooted the Tracinda offer before Bear Stearns rendered a formal opinion on the proposed deal, its internal documents reflect the fact that its experts had apparently concluded by July 29 that the proposed offer at $18 per share was fair to the common stockholders from a financial point of view.

Plaintiff suggests that Kerkorian did not entertain a serious interest in acquiring the remaining common stock of the Company but rather announced the proposed Tracinda deal in order to stimulate other offers. Be that as it may, shortly after Tracinda made its announcement, it was approached about a possible acquisition of MGM Grand's hotel properties. Kerkorian was receptive to exploring such alternatives, but no actual offer was forthcoming.

In August, 1985, the Drexel Burnham firm was engaged to explore alternatives to the Tracinda offer. That firm made a significant effort to instigate possible alternative deals—apparently some 50 firms were contacted, but the only indication of serious interest it apparently received was from Bally Manufacturing Corp.[2]

**1.** Kerkorian's ownership of both the preferred and MGM Grand's common stock was increased as a result of an October 1, 1984, cash tender offer for up to 5 million shares of common stock and up to 2 million shares of preferred stock at a price of $12 per share. As earlier indicated, today Mr. Kerkorian owns directly or indirectly approximately 74% of the outstanding preferred stock and approximately 69% of MGM Grand's common stock.

**2.** Previously, in July, 1985, Bear Stearns had approached Bally and suggested that perhaps Bally might be interested in purchasing MGM Grand common stock at a price of $18 per share. Bally's Chief Financial Officer, Donald

In early November, 1985, Kerkorian, Stephen Silbert, his principal legal advisor, and representatives of Drexel Burnham met with Robert Mullane, the chairman and chief executive officer of Bally to discuss Bally's interest. At that meeting Bally apparently ultimately took the position that it thought all of the Company's equity was worth $440 million and said it would be willing to make a cash offer at that price for all the Company's stock—common and preferred. (Silbert Dep. at p. 92).

It seems agreed by all parties that Bally made a total price offer and had no real input into the way in which that consideration would be divided among classes of MGM Grand's stock (Romans Dep., pp. 45–46), although its concurrence was obviously required. Kerkorian and Silbert had, however, discussed that question prior to the meeting, and Kerkorian had expressed the view that the common stock should get $18 a share since Tracinda had already announced an offer at that price. (Silbert Dep. at pp. 94–95).

Kerkorian, after discussions with his lawyer Silbert and with Drexel Burnham (Kerkorian Dep., pp. 65–67), apparently determined that $14 was the price that would be paid for the preferred. (Silbert Dep. at pp. 99–102). However, a $14 per share price for the outstanding preferred, when added to an $18 price for all the common stock, would result in a cash price in excess of $440 million for all of the Company's stock. To solve this problem, Kerkorian agreed to take $12.24 per share for his common stock together with certain other property, including transfer of the exclusive rights to the name MGM Grand Hotels and certain contingent rights in litigation proceeds.[3] This non-cash property has been the subject of an appraisal and, in part on the basis of that appraisal, Bear Stearns has

opined that the total value of the consideration Kerkorian will receive for his common stock is less than $18 per share.

The detailed terms of the Bally merger and the documents reflecting them were negotiated over a week of meetings commencing a few days after the Kerkorian/Mullane meeting at which the cash price was agreed upon. On November 14, a special meeting of the MGM Grand board was held to consider the proposed Bally merger. At that meeting Drexel Burnham reported on its efforts to locate parties with an interest in acquiring the Company, the results of its work, and its evaluation of the Bally proposal as negotiated. Although not retained to render an opinion on the fairness of the proposed transaction, Drexel Burnham did report its opinion that the price contemplated by the proposal for the common stock and the preferred stock was fair. (Humphreville Aff., ¶ 9). The directors were presented with copies of the proposed agreement of merger. After discussing the proposal, the meeting was adjourned without board action. The meeting was reconvened the following morning and, after further discussion, the board approved the transaction. (Benedict Aff., ¶¶ 12–14). The amended and restated agreement and plan of merger was executed shortly thereafter.

At the time the Company's board authorized the execution of the merger agreement, it had no advice from an independent investment banker as to the fairness of the proposed deal to the minority stockholders of the Company. Thereafter Bear Stearns, who had earlier done some work in evaluating the fairness of an $18 price for the common in connection with the proposed Tracinda deal, was retained to opine on the fairness from a financial point of view of

Romans, did some calculations and concluded that, "... the price was too rich at 18 for the common to be of interest to Bally." (Romans Dep. at pp. 8–9; 17).

**3.** Specifically, should the merger be effectuated, Kerkorian would receive a right to any recovery from the property insurance litigation, in excess

of $59,500,000. His company Tracinda, however, must guarantee that MGM Grand will recover at least $50 million (plus interest) from those claims and Kerkorian will reimburse MGM Grand certain litigation expenses incurred by MGM Grand following the merger.

the terms of the merger agreement. The merger agreement, however, contains no condition that would permit the board to abandon the transaction if an acceptable opinion of the company's investment banker was not obtainable.

The opinion that was requested was to reflect Bear Stearns' view of the fairness of the $14 price for the preferred and its view whether the consideration to be received by Kerkorian for his common stock had a value that was less than that to be received by the public common stockholders. Bear Stearns' opinion was rendered on February 11, 1986, and concluded that "the aggregate consideration [to be] received by Tracinda and Mr. Kerkorian for their shares of Common Stock [on a per share basis] is less than the consideration per share to be received by the Public Shareholders of the Company's Common Stock ..." and that "the price to be paid for the Preferred Stock ... is fair from a financial point of view ...".

After receipt of that opinion, the directors authorized distribution of the proxy materials relating to the proposed transaction. At the Company's annual meeting of stockholders, held on March 14, 1986, 17,675,942 shares of the Company's common stock (77.5% of all of the issued and outstanding common stock) voted in favor of the proposed merger and 148,145 shares (7.11% of the voting shares not controlled by Kerkorian) voted against the merger. The preferred stock had not right to vote on the merger. Only 5,081 preferred shares (less than ½ of 1% of the outstanding preferred shares not controlled by Mr. Kerkorian) have requested an appraisal of their stock in lieu of the consideration offered by the merger.

## II.

Plaintiff claims that the proposed merger constitutes a breach of a fiduciary duty owed by the directors of MGM Grand and its controlling shareholder to the preferred stockholders. As developed at oral argument, the central aspect of plaintiff's theory of liability involves a breach of the duty of loyalty, although plaintiff contends as well that the manner in which the merger was negotiated and approved constitutes a breach of a duty of care.

The main argument advanced by plaintiff is premised upon the assertion that the directors of a Delaware corporation have a duty in a merger transaction to negotiate and approve only a merger that apportions the merger consideration fairly among classes of the company's stock. To unfairly favor one class of stock over another is, on this view, a breach of the duty of loyalty that a director owes to the corporation and, by extension, that he owes equally to all of its shareholders. Asserting factually that under all the circumstances the two outstanding classes of MGM Grand's stock represent equivalent values, plaintiff contends that the proposed Bally merger which does not apportion the merger consideration equally breaches this duty.

Several evidentiary factors are pointed to in order to establish the factual predicate of the argument: the equivalency implied in the original one-for-one exchange offer; the fact that the Company's auditors treated the preferred as equivalents for the purpose of stating the Company's per-share earnings; the fact that one possible merger candidate apparently considered making the same offer to both classes of stock; and that Kerkorian himself offered $12 per share for both common and preferred in his 1984 tender offer. Finally it is asserted that the market treated both securities as reflecting equivalent value (a contention that is warmly contested).

Plaintiff thus compares the $18 per share price that the public common stockholders are to receive with the $14 per share into which the preferred stock is to be converted and perceives an unfairness. Plaintiff offers an explanation of why this unfairness to the preferred resulted—an explanation that seems required by the fact that the *controlling shareholder owns a greater proportion of the preferred* (74%) than of the common stock (69%). That explanation

posits that in apportioning the merger consideration, Kerkorian felt compelled to allocate $18 per share to the common in order to protect himself from possible lawsuits arising from persons who had purchased MGM Grand common stock after the market price for that stock had risen in response to Kerkorian's announcement of a forthcoming $18 cash out merger with Tracinda. Abandonment of that deal for another that would yield the common less, it is contended, would have exposed Kerkorian to charges of manipulation and to litigation. Thus, in allotting the proceeds of the merger among the Company's two classes of stock, plaintiff complains that Kerkorian sought to avoid a potential personal liability. Moreover, he was not only self-interested in the allocation as a result but he cannot, it is asserted, meet his burden to establish that the resulting apportionment was fair to the preferred.

Intertwined with this central contention, are a host of other liability theories, including arguments (1) that the board of MGM Grand violated its duty of care in negotiating and approving the merger (relying heavily in that connection on the recent holding of our Supreme Court in *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985)); (2) that in instigating the merger at this time and in arrogating to himself the power to negotiate the terms of the merger on behalf of the corporation, Kerkorian (without regard to the specific terms ultimately agreed upon) acted without legal authority and in breach of duties to the preferred; and (3) that the merger constitutes a manipulation of the corporate machinery of the Company in order to avoid paying the preferred a $20 redemption price.

Finally, plaintiff seeks to cast the net of his liability theories over Bally as well by arguing that it is a knowing participant in the breach of duty ascribed to Kerkorian and the members of the MGM Grand board. It is elementary, of course, that one who knowingly participates with a fiduciary in a breach of trust may share a resulting liability to an injured *cestui que trust*. See, e.g., *Penn Mart Realty Co. v. Becker*, Del.Ch., 298 A.2d 349 (1972); *Gilbert v. El Paso Co.*, Del.Ch., 490 A.2d 1050 (1984); cf, *Restatement (Second) of Trusts* § 290 (1959).

### III.

The test justifying the issuance of a preliminary injunction has frequently been reiterated by this Court. In each case it is necessary for plaintiff to establish a reasonable probability that her claims will be vindicated at final hearing; that unless the provisional remedy is granted she will suffer irreparable injury before her claims may be finally adjudicated; and that any threatened injury to the defendant (or others) that may result from the improvident issuance of a preliminary injunction does not outweigh the injury with which she is presently threatened. *Shields v. Shields*, Del.Ch., 498 A.2d 161 (1985).

For the reasons more fully set forth below, I conclude that plaintiff has failed to demonstrate the requisite probability of ultimate success that is essential in these circumstances. In summary, I conclude for the limited purpose of determining this motion that plaintiff has not established a legal right of the preferred to equivalent consideration in a merger and that with respect to the distinct right to a fair apportionment of the merger proceeds, plaintiff has not established a reasonable probability that such a right will be transgressed by the effectuation of the Bally merger. Finally, I have concluded that plaintiff has not demonstrated a probability of ultimate success on her theories of liability resting upon (a) an alleged breach of a duty of care; (b) claims that the timing and structure of the merger evidence a lack of fair dealing or (c) that the merger constitutes a manipulation of corporate machinery for an inappropriate purpose—the evasion of a legal duty, at some future time, to redeem the preferred at $20 per share.

## IV.

Initially I address two preliminary although critical legal questions: first, whether, in these circumstances, defendants owe any fiduciary duties to the preferred at all and, second, what standard—entire fairness or business judgment—is appropriate to assess the probability of ultimate success.

### A.

Issue on the merits of claims alleged is first joined on the fundamental question whether the directors of MGM Grand owe *any* duty to the holders of the preferred stock other than the duty to accord to such holders the rights, powers and preferences set out in the certificate designating and defining the legal rights of the preferred. As I understand plaintiff's principal theories of liability each is premised upon the existence of a supervening fiduciary duty recognized in equity that requires directors and controlling shareholders to treat shareholders fairly. *See, Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983); *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107 (1952); *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503 (1939). If there is no such duty insofar as preferred stockholders are concerned plaintiff's theories of liability would seem fatally flawed.

Defendants contend there is no broad duty of fidelity owed to preferred stock if that duty is understood to extend beyond the specific contractual terms defining the special rights, preferences or limitations of the preferred. In support of its position on this point defendants cite such cases as *Rothschild International Corp. v. Liggett Group, Inc.*, Del.Supr., 474 A.2d 133 (1984); *Wood v. Coastal States Gas Corp.*, Del. Supr., 401 A.2d 932 (1979) and *Dart v.*

*Kohlberg, Kravis, Roberts & Co.*, Del.Ch., C.A. No. 7366, Hartnett, V.C. (May 6, 1985). Broadly speaking these cases apply the rule that "preferential rights are contractual in nature and therefore are governed by the express provisions of a company's certificate of incorporation" *Rothschild, supra,* 474 A.2d at 136. Defendants restate this accepted principle as meaning "all rights of preferred shareholders are contractual in nature".[4] They then go on to argue (analogizing to the wholly contractual rights of bondholders—as to which no "fiduciary" duties extend[5]) that the only duties directors have to preferred shareholders are those necessary to accord the preferred rights set out in their contract, i.e., the document designating the rights, preferences, etc., of their special stock.

▬ The flaw in this argument lies in a failure to distinguish between "preferential" rights (and special limitations) on the one hand and rights associated with all stock on the other. At common law and in the absence of an agreement to the contrary all shares of stock are equal. *Shanghai Power Co. v. Delaware Trust Co.*, Del. Ch., 316 A.2d 589 (1974). Thus preferences and limitations associated with preferred stock exist only by virtue of an express provision (contractual in nature) creating such rights or limitations. But absent negotiated provision conferring rights on preference stock, it does not follow that no right exists. The point may be conclusively demonstrated by two examples. If a certificate designating rights, preferences, etc. of special stock contains *no* provision dealing with voting rights or *no* provision creating rights upon liquidation, it is not the fact that such stock has no voting rights or no rights upon liquidation. Rath-

---

**4.** Certain language in the cases restating the principle quoted above would support defendants' interpretation. For example, in *Judah v. Delaware Trust Company*, Del.Supr., 378 A.2d 624 (1977) it is said (at p. 628): "Generally, the provisions of the certificate of incorporation govern the rights of preferred shareholders, the certificate ... being interpreted in accordance with the law of contracts, with only those rights which are embodied in the certificate granted to preferred shareholders."

**5.** *See, e.g., Revlon, Inc. v. MacAndrews & Forbes, Inc.*, Del.Supr., 506 A.2d 173, 182 (1986); *Katz v. Oak Industries, Inc.*, Del.Ch., 508 A.2d 873 (1986).

er, in such circumstances, the preferred stock has the same voting rights as common stock (8 *Del.C.* § 212(a); *Rice & Hutchins, Inc. v. Triplex Shoe Co.,* Del. Ch., 147 A. 317 (1929) *aff'd.,* 152 A. 342 (1930)) or the same rights to participate in the liquidation of the corporation as has such stock (11 W. Fletcher Cyclopedia of the Law of Private Corporations § 5303 (rev. perm. ed. 1971); *Continental Insurance Company v. Reading Company,* 259 U.S. 156, 42 S.Ct. 540, 66 L.Ed. 71, 871 (1922)).

■ Thus, with respect to matters relating to preferences or limitations that distinguish preferred stock from common, the duty of the corporation and its directors is essentially contractual and the scope of the duty is appropriately defined by reference to the specific words evidencing that contract; where however the right asserted is not to a preference as against the common stock but rather a right shared equally with the common, the existence of such right and the scope of the correlative duty may be measured by equitable as well as legal standards.

With this distinction in mind the Delaware cases which frequently analyze rights of and duties towards preferred stock in legal (i.e., contractual) terminology (*e.g., Wood v. Coastal States Gas Corp., supra; Judah v. Delaware Trust Company,* Del.Supr., 378 A.2d 624 (1977); *Rothschild International Corp. v. Liggett Group, Inc., supra* ) may be made consistent with those cases that apply fiduciary standards to claims of preferred shareholders (*e.g., David J. Greene & Co. v. Schenley Industries, Inc.,* Del.Ch., 281 A.2d 30 (1971); *Lewis v. Great Western United Corporation,* Del.Ch., C.A. No. 5397, Brown, V.C. (September 15, 1977)).

■ Accordingly, without prejudging the validity of any of plaintiff's liability theo-

ries, I conclude that her claim (a) to a "fair" allocation of the proceeds of the merger; (b) to have the defendants exercise appropriate care in negotiating the proposed merger and (c) to be free of overreaching by Mr. Kerkorian (as to the timing of the merger for his benefit) fairly implicate fiduciary duties and ought not be evaluated wholly from the point of view of the contractual terms of the preferred stock designations.[6]

### B.

Assuming that plaintiff and the other preferred shareholders have a "right" recognized in equity to a fair apportionment of the merger consideration (and such a right to require directors to exercise appropriate care) it becomes material to know what legal standard is to be used to assess the probability that a violation of that right will ultimately be proven. Plaintiff asserts that the appropriate test is one of entire or intrinsic fairness. That test is the familiar one employed when fiduciaries elect to utilize their power over the corporation to effectuate a transaction in which they have an interest that diverges from that of the corporation or the minority shareholders. *See, Weinberger v. UOP, Inc., supra; Gottlieb v. Heyden Chemical Corp.,* Del. Supr., 91 A.2d 57 (1952).

■ Our Supreme Court has made it quite clear that the heightened judicial scrutiny called for by the test of intrinsic or entire fairness is not called forth simply by a demonstration that a controlling shareholder fixes the terms of a transaction and, by exercise of voting power or by domination of the board, compels its effectuation. (The apparent situation presented in this action.) It is in each instance essential to show as well that the fiduciary has an interest with respect to the transaction that conflicts with the interests of minority

---

**6.** The claim that the merger constitutes a wrongful attempt to circumvent the $20 redemption provision of the preferred stock, on the other hand, does, in my view, relate to a negotiated preference and must be evaluated strictly as a

contract right. On such basis it is clear that plaintiff has demonstrated no reasonable probability of ultimate success. *See, Rothschild International Corp. v. Liggett Group, Inc., supra; Dart v. Kohlberg, Kravis, Roberts & Co., supra.*

shareholders. *Aronson v. Lewis,* Del. Supr., 473 A.2d 805, 812 (1984). Speaking in the context of a parent dealing with a controlled but not wholly-owned subsidiary our Supreme Court has said:

The basic situation for the application of the rule [requiring a fiduciary to assume the burden to show intrinsic fairness] is the one in which the parent has received a benefit to the exclusion and at the expense of the subsidiary.

\* \* \* \* \* \*

A parent does indeed owe a fiduciary duty to its subsidiary when there are parent-subsidiary dealings. However, this alone will not evoke the intrinsic fairness standard. This standard will be applied only when the fiduciary duty is accompanied by self-dealing—the situation when a parent is on both sides of a transaction with its subsidiary. Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary.

*Sinclair Oil Corporation v. Levien,* Del. Supr., 280 A.2d 717, 720 (1971).

■ As to what appears to be the material element of the negotiation of the Bally merger—the $440,000,000 cash price—Mr. Kerkorian had no conflicting interest of a kind that would support invocation of the intrinsic fairness test. With respect to total price, his interest was to extract the maximum available price. Moreover, as to the apportionment of the merger consideration between the two classes of the Company's stock, Mr. Kerkorian's interest again appears to create no significant bias on his part since his ownership of each class is not only great but substantially equal. Indeed, as indicated, Kerkorian's ownership of the preferred is proportionately somewhat greater.

Thus, had Kerkorian apportioned the merger consideration equally among members of each class of the Company's stockholders (as distinguished from equally between classes of stock on a per share basis), then the fact of his substantially equivalent ownership of each class of stock would have supported invocation of the legal test known as the business judgment rule. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984). The fact that each class was treated differently would not itself require application of the intrinsic fairness test. *See, MacFarlane v. North American Cement Corp.,* Del.Ch., 157 A. 396 (1928); *Bodell v. General Gas & Electric Corp.,* Del.Supr., 140 A. 264 (1927).

But Kerkorian directed the apportionment of merger consideration in a way that treated himself differently from other holders of common stock. He accorded to himself less cash per common share ($12.24) but, in the License Agreement, arrogated to himself the right to use or designate the use of the MGM Grand name and, under the Price Adjustment Agreement, he is to assume certain obligations and acquire certain rights with respect to pending property insurance claims of the Company.

In according to himself a different form of consideration in the merger, Mr. Kerkorian has created a situation in which the fact of his substantially equivalent ownership of each class of stock does not itself negate the existence of a conflicting interest on his part in making the allocation decision. Do these agreements create the possibility of a substantial conflict that would mandate the enhanced judicial scrutiny contemplated by the intrinsic fairness test? As to the License Agreement, for the reasons set forth in the margin, I am persuaded the answer is no.[7]

7. The reasons are two. First, I regard the subject matter of the license as of *de minimis* value in these circumstances. It was valued at $1.3 million by an independent appraisal firm. In the context of a cash price of $440 million for a company of which Kerkorian owns roughly 70% that amount would not appear to create a material conflict. Secondly, it appears that the right to use the MGM Grand name is being transferred to a new company whose stock will

The Price Adjustment Agreement deals with an asset of MGM Grand that was doubtlessly difficult for Bally to value—insurance claims arising from the company's losses caused by the 1980 fire. Those claims have been in litigation for some time and apparently are complex. In the Price Adjustment Agreement Kerkorian (through Tracinda) removes the uncertainty that such claims create, by (1) guaranteeing that MGM Grand will recover $50 million on the claims treated, (2) undertaking to continue to supervise the litigation and (3) agreeing to pay one-half of the first $1,000,000 of legal fees incurred by MGM Grand following the merger with respect to the claims and all such costs in excess of $1,000,000. In exchange for these undertakings Kerkorian receives the right to all amounts recovered by the Company on the claims in excess of $59.5 million.

To assess the possible impact of the Price Adjustment Agreement on the negotiation and apportionment process, I find it necessary to dilate on these claims for a moment. The amount of the litigated claims appears to be approximately $55,000,000 plus pre-judgment interest. The record contains no information concerning whether pre-judgment interest is recoverable on such a claim under the applicable law or, if it is, in what amount. Assuming the full claim is ultimately awarded and that interest at a rate of, say 9%, is also awarded, (interest, for the period from the November, 1980 loss to the November, 1985 signing of the merger agreement, would thus amount to $29,624,000) there would be a total recovery of $84,624,000. On these not unreasonable assumptions, the maximum value of the contingent litigation rights (without any discount for probability of success and with no deduction for the actuarial value of the $50,000,000 guaranty) would be approximately $25,000,000 or approximately 80¢ per share, when all shares, common and preferred,

are included. I do not regard that amount as *de minimis*.

It cannot be said, in my view, that the Price Adjustment Agreement constitutes an independent deal unrelated to the negotiation of the proposed merger. Just as clearly, the opportunity to participate in recoveries on the Company's property claims is one that the deal fashioned by Mr. Kerkorian denies to all other stockholders. I conclude therefore that, in apportioning that element of consideration wholly to his own shares to the exclusion of others Kerkorian was exercising power of a kind and in circumstances justifying invocation of the heightened standard of judicial review.

V.

I also conclude that, as to the claim of the preferred to an equal or fair share of the merger proceeds, the defendants are likely to meet the burden thus imposed upon them. It follows that plaintiff has failed to demonstrate a reasonable probability of success on this issue.

■ First, it seems elementary that the preferred has no *legal* right to equivalent consideration in the merger. Neither the certificate of incorporation nor the certificate of designation of the preferred stock expressly creates such a right. Nor does it appear that such a right may be fairly implied from those documents when read in the light of the terms of the 1982 Exchange Offer. *Cf., Katz v. Oak Industries, Inc.,* Del.Ch., 508 A.2d 873 (1986). Nor do I perceive any basis to recognize an *equitable* right to mathematically equal consideration based upon the conduct of Kerkorian as a fiduciary. Some of what is said below (see, e.g., pp. 598–599, *infra*) supports this conclusion.

■ As to a right of the preferred to have the total consideration fairly (as distinguished from equally) apportioned, the

be offered to all current MGM Grand shareholders, both common and preferred,—but only to such persons—on the same basis as available to Kerkorian. Thus, while under the merger

agreement Kerkorian has the power to dispose of the MGM Grand name, in fact the disposition he is making is such as to negate the existence of a conflict with respect to that asset.

current record provides no persuasive basis to conclude that the allocation contemplated by the Bally merger is unfair.

Plaintiff's claim of unfairness in an apportionment of $18 per share to the common stockholders and $14 a share to the preferred, in my opinion, involves a fundamental defect: it rests upon an invalid comparison. The pertinent comparison, if one is treating a right to fair apportionment among classes of stock, is between what those *classes* receive in the merger, on a per share basis, not between what the class of preferred receive per share and what the public holders of common stock are to receive. As shown below, when the financial value of the appropriate comparison is developed (to the extent the current record permits the development and evaluation of that comparison) it does not appear very great and certainly does not at this stage appear unsustainable in light of the differences in the rights of common and preferred stockholders and the historical treatment of both classes of stock by the market.[8]

The essential right plaintiff asserts is the right of the preferred to be treated as well as the common in the merger. There are now outstanding 22,803,194 common shares and 8,549,000 preferred. Thus, in all, there are 31,352,194 shares of MGM Grand stock. But when the total cash consideration— $440 million—is divided by the total number of shares, common and preferred, outstanding the result is $14.03 per share.

But in addition to cash, some MGM Grand common stockholders (i.e., Kerkorian) will get other non-cash consideration that ought to be considered in comparing the financial treatment of the two classes of stock in the merger. If for these purposes we treat the value of the MGM Grand name as worth $1.3 million (its appraised value) and the value of contingent right to litigation proceeds as worth approximately $25 million (for the reasons described above) then it appears that the total value of the merger consideration is approximately $463.3 million. Dividing that number by 31,352,194 yields an average consideration per share for all stockholders of $14.87. Thus, if each preferred stockholder received the average consideration per share that all shareholders will receive, each preferred share would receive, on the foregoing assumption, not $14.00 but $14.87. In fact, the common stock *as a class* will not receive the $14.87 average for all shareholders but will receive total consideration (on the foregoing assumption) of $15.20 per share.[9]

Given the fact that the preferred has no prospect for a future increment in dividends, no vote, and has historically tended to trade at a discount from the common (*see*, Jelenko Aff. and note 8, *supra*), I cannot conclude that the $14 per share

---

**8.** Judging from the record now available, it appears to be an exaggeration to state that the market has historically accorded equal value to MGM Grand's preferred and common stock. It does appear that for most of the months during the period from issuance (5/82) through announcement of the Tracinda offer (6/85) the common traded at a price less than 130% of the market price of the preferred. Typically, during that period, the common did trade at a higher price than did the preferred. Specifically, it appears that during that 37-month period, in 15 of 37 such months the closing high price for MGM Grand's common stock during the month was within ± 10% of its preferred high closing price for the month (in 20 of 37 months its lowest closing price was ± 10% of the lowest closing price of its preferred). In 9 of 37 months, its highest monthly closing price was between 10 and 20% greater than the high price of the preferred (in 10 of 37 months, its low price was

greater within that range) and in 13 of 37 months the price of common measured at its high price was greater than 120% of the high price of the preferred achieved during that month (in 6 of 37 months, when low prices are so compared). During 7 months in 1983 the price of common ranged from approximately 135% of the price of the preferred to approximately 175% of the preferred when measured by monthly high prices (and from 125% to 145% when measured by the lowest prices to which both stocks fell during each such month). *See*, Jelenko Aff., Exh. II.

**9.** On those assumptions, they will receive an average of $14.05 cash (i.e., $440 million − $119.7 million to be paid to preferred = $320.3 million ÷ 22,803,194 common shares = $14.05 cash per share) + $1.15 non-cash (i.e., $25 million + $1.3 ÷ 22,803,194 = $1.15) = $15.20.

price (which represents a 6% discount from the $14.87 per share average value for all shares) is likely to be found not to be entirely appropriate.

Plaintiff might fairly say that the foregoing analysis does not meet the real thrust of her contention. That is, she would argue that the meaningful difference in the preferred's consideration is not between their $14 per share and the average to be received by all shares ($14.87 on the assumption set out above) but between $14 and $18 to be recovered by the public holders of the common stock. This difference—simply because it is materially larger—would be more difficult to justify.

But it is this comparison that I refer to as invalid. It is true that the common as a class is not getting the average of all shareholders—$14.87 on my assumption concerning the value of the contingent litigation rights—but is getting $15.20 per share on that assumption. That difference ($.33 per share), if it is to be justified, must be justified by reference to the difference in the legal claims and economic prospects of the two classes of stock. As indicated above, I cannot conclude on the present record that that justification is unlikely to be demonstrated.

The further difference—between $15.20 per share for the common as a class and the $18 per share that the public holders of common stock will receive need not be so justified in my opinion; it is clearly being funded entirely by Kerkorian personally. That is, the amount of the total increment to be received by the *public* holders of common stock over the average per share consideration to be received by the common stock as a class (7,064,021 public common shares × ($18.00 − $15.20) = $19,779,259) is supplied by Kerkorian, who has taken less for his common stock, even when the non-cash consideration is considered ($12.24 cash + 1.67 non-cash [10] = $13.91 per share). Thus, the amount per share that Kerkorian has given up ($15.20 − $13.91 =

$1.29 per share) when multiplied by his total common stock holdings (15,739,173) equals $20,303,533 and more than fully funds the increment that the public common stockholders will receive over the average per share price to be received by common stockholders as a class.

Thus, if plaintiff is correct that Kerkorian sought to make sure the public common stockholders got $18 per share because he feared some potential liability if they got less, the rejoinder is that, to the extent the public holders of common are to receive more than all common stock as a class, Kerkorian paid for that benefit from his own pocket.

■ Assuming for purposes of this motion that plaintiff is correct in asserting that $18 per share is an unjustifiably generous price for the publicly held common stock, plaintiff's claim to equal treatment inescapably involves an implied right to require self-sacrifice from a fiduciary. While the law requires that corporate fiduciaries observe high standards of fidelity and, when self-dealing is involved, places upon them the burden of demonstrating the intrinsic fairness of transactions they authorize, the law does not require more than fairness. Specifically, it does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders. It follows that should a controlling shareholder for whatever reason (to avoid entanglement in litigation as plaintiff suggests is here the case or for other personal reasons) elect to sacrifice some part of the value of his stock holdings, the law will not direct him as to how that amount is to be distributed and to whom.

Accordingly, I conclude for purposes of this motion that when the appropriate comparisons are made, the different treatment contemplated by the Bally merger of the

---

**10.** That is, $25,000,000 value of contingent recovery + $1,300,000 value of MGM Grand name divided by 15,739,173 common shares owned by Kerkorian.

two outstanding classes of the Company stock is unlikely—given the different legal claims and economic prospects those classes of stock possess—ultimately to be found to constitute a breach of a duty the defendants may have had in the circumstances to apportion the merger proceeds fairly.

### VI.

Nor do I find a likelihood that other aspects of the initiation, negotiation and approval of the proposed merger create a reasonable prospect of plaintiff's ultimate success in this action. Plaintiff weaves together several strands to fashion an argument that the process involved constitutes a breach of duty by the directors and Kerkorian. While articulated by plaintiff as constituting a breach of "entire fairness" (i.e., the duty of loyalty) it is clear that plaintiff intertwines claims of breach of care as well.

The gist of these supporting points is as follows: the timing of the merger was at Kerkorian's behest and served his personal interest; the minority shareholders, common or preferred, had no veto of the transaction; no independent committee of the board was charged to protect their interest in the apportionment; no prior independent investment banking opinion was received by the board before it committed itself to the transaction; and the board acted hurriedly and without due care.

 As to the timing of the transaction, it seems correct that a merger transaction was pursued and authorized by the MGM Grand board at this time because it suited Kerkorian's plans and (so far as the record shows) not because the board determined that this was a particularly propitious moment to sell the Company. The timing of such a transaction, we have been authoritatively reminded, may be such as to constitute a breach of a fiduciary's duty

to deal fairly with minority shareholders. *See Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983). But more must be shown, in my view, than that a majority shareholder controlled the timing of the transaction; that will always be true with respect to a transaction involving shareholder approval since, minimally, such a shareholder may veto such a transaction. The prototype instance in which the timing of a merger would itself likely constitute a breach of a controlling shareholder's duty is when it could be shown both (1) that the minority was financially injured by the timing (i.e., from their point of view it was an especially poor time to be required to liquidate their investment) and (2) that the controlling shareholder gained from the timing of the transaction what the minority lost. *Compare, Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717 (1971).[11] Neither element has been shown here. Most importantly, there is no persuasive indication on this preliminary record that from the minority's point of view this is a particularly poor time to liquidate their investment. Accordingly, I conclude that the timing of the proposed Bally transaction, even though it is assumedly in Kerkorian's personal interest, does not suggest itself as a likely basis for ultimate vindication of plaintiff's claims.

 As to the fact that the transaction was not structured to accord minority shareholders a veto, nor was an independent board committee established to negotiate the apportionment of merger consideration on behalf of the minority, these are pertinent factors in assessing whether fairness was accorded to the minority. The presence of such factors typically constitute indicia of fairness; their absence, however, does not itself establish any breach of duty. Where the test of the intrinsic fairness of a self-interested transaction is employed, the ultimate question is whether

---

**11.** Whether it would be enough to make out a breach of entire fairness to show only that it was a particularly poor time to liquidate an investment, but that a controlling shareholder nevertheless forced a third party transaction for reasons personal to his own situation, is a question that may be left for another day.

the terms of the transaction itself are entirely or intrinsically fair. For the reasons outlined above, I find no reasonable probability on the present record that that test will not ultimately be met in this case. The existence of procedures of the kind here treated would bolster that conclusion, but their absence in these circumstances does not itself affect my assessment of plaintiff's probability of success.

■ As to the strand of plaintiff's argument asserting lack of due care, I am unpersuaded—given Kerkorian's intense interest in achieving the highest available price, and given the apparently thorough search conducted by Drexel Burnham of alternative possibilities—that it is likely that the director defendants will be found to have failed in the circumstances to have fulfilled their duty to exercise their corporate power with due care.

## VII.

The foregoing evaluation of the probabilities of ultimate success forecloses the necessity for an evaluation of plaintiff's claim of irreparable injury. However, in denying the pending motion, I am sensitive to the interests of the public common stockholder and of Bally to have the proposed merger effectuated without judicial interference. While the complaint in conclusory language alleges that Bally knowingly participated in a breach of fiduciary duty, no specific facts are alleged—nor so far as the present record discloses have facts been uncovered in discovery—that would support that conclusion. In these circumstances, Bally's contract rights—while not dispositive [12]—present an additional circumstance supporting the denial of the pending motion.

For the foregoing reasons, plaintiff's application for a preliminary injunction shall be denied. IT IS SO ORDERED.

---

**12.** Historically courts of equity have accorded great deference to the rights of bona fide purchasers from trustees who have no notice of a breach of trust. Such persons will ordinarily cut off the equitable title of a *cestui que trust. See,* Ames, *Purchaser for Value without Notice,* 1 Harv.L.Rev. 1 (1887). However, that doctrine has not extended to contract vendees. *See,* Bogart, *Trusts and Trustees,* § 885 (1982). This limitation is apparently a specific application of the more general principle that "as between competing equitable claimants [into which class a contract vendee would fall], he that is prior in time is stronger in law". Ames, *supra,* at p. 8.