# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CEDARVIEW OPPORTUNITIES MASTER FUND, L.P., CETUS CAPITAL III, L.P., CORRIB CAPITAL MANAGEMENT, L.P., LITTLEJOHN OPPORTUNITIES MASTER FUND L.P., RAVENSOURCE FUND, STONEHILL INSTITUTIONAL PARTNERS, L.P., STONEHILL MASTER FUND LTD., STORNOWAY RECOVERY FUND L.P., VSS FUND, L.P., WEST FACE LONG TERM OPPORTUNITIES GLOBAL MASTER L.P., and WOLVERINE FLAGSHIP FUND TRADING LIMITED, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) | C.A. No. 2017-0785-AGB |
|  | ) |  |
| SPANISH BROADCASTING SYSTEM, INC., | ) ) ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## MEMORANDUM OPINION

Date Submitted: May 1, 2018
Date Decided: August 27, 2018

Jon E. Abramczyk, D. McKinley Measley, and Alexandra M. Cumings of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Shireen A. Barday of KIRKLAND & ELLIS LLP, New York, New York; Patrick J. Nash of KIRKLAND & ELLIS, Chicago, Illinois; *Counsel for Plaintiffs*.

Robert S. Saunders, Matthew P. Majarian, and Haley S. Stern of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Counsel for Defendant*.


**BOUCHARD, C.**

This action is the latest in a series of disputes that have led to litigation in this court between Spanish Broadcasting System, Inc., a Spanish-language media and entertainment company that operates in the United States, and holders of its Series B preferred stock.[1] This iteration involves essentially two distinct disputes.

First, certain Series B holders have filed claims asserting that the Company improperly incurred "Indebtedness" without their consent in violation of the certificate of designations governing the Series B preferred stock and the implied covenant of good faith and fair dealing. For these alleged violations, the Series B holders seek damages and certain forms of specific performance.

Second, the Series B holders have filed claims asserting that the Company improperly cancelled their share certificates and suspended virtually all of their rights as Series B holders in violation of the Company's certificate of incorporation, which contains certain limitations on the percentage of foreign or "alien" ownership of its capital stock. These limitations parallel provisions of the Communications Act of 1934 that regulate foreign investment in entities that control a United States broadcast license. For these alleged violations, the Series B holders seek damages

---

[1] *See Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broad. Sys., Inc.*, 2015 WL 2400712 (Del. Ch. May 19, 2015); *Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broad. Sys., Inc.*, 2014 WL 2943570 (Del. Ch. June 27, 2014); *Lehman Bros. Holdings Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430 (Del. Ch. Feb. 25, 2014).

and a declaratory judgment that the operative provision of the certificate of incorporation is invalid.

The Company has moved to dismiss all of the Series B holders' claims under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. It also has moved to dismiss the declaratory judgment claim under Court of Chancery Rule 12(b)(1) for lack of ripeness. For the reasons explained below, the motion is granted in part and denied in part.

## I.    BACKGROUND

The facts recited in this opinion are taken from the Verified Amended Complaint filed on December 22, 2017 (the "Amended Complaint")[2] and documents incorporated therein.[3]  Any additional facts are either not subject to reasonable dispute or subject to judicial notice.

### A.    The Parties

Defendant Spanish Broadcasting System, Inc. ("SBS" or the "Company") is a Spanish-language media and entertainment company that operates radio and television stations in Hispanic markets throughout the United States.  Non-party Raúl Alarcón Jr. is the Company's Chairman, CEO, and President.  He is also SBS's

---

[2] Dkt. 9.

[3] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citation and internal quotations omitted) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

controlling stockholder, holding approximately 85% of the combined voting power of its two classes of common stock.

Plaintiffs hold approximately 94.16% of SBS's outstanding 10 ¾% Series B Cumulative Exchangeable Redeemable Preferred Stock (the "Series B Preferred Stock," and all holders thereof, the "Series B Holders").[4] Certain of these plaintiffs, holding approximately 69.9% of the outstanding Series B Preferred Stock, are foreign entities.[5] The Communications Act of 1934, 47 U.S.C. § 151, *et seq.* (the "Communications Act"), refers to such foreign entities as "aliens."

Some of the plaintiffs also hold SBS's 12.5% senior notes (the "Senior Notes"). In total, plaintiffs hold approximately $85,265,000 of the face amount of the Series B Preferred Stock and $30,792,000 in principal amount of the outstanding Senior Notes.[6]

### B. The Series B Preferred Stock

On October 29, 2003, SBS authorized the issuance of Series A Preferred Stock.[7] On February 18, 2004, the Company issued shares of Series B Preferred Stock in exchange for the outstanding Series A, pursuant to a certificate of

---

[4] Am. Compl. ¶ 2.

[5] Am. Compl. ¶¶ 13-22; Ex. D at 9-11.

[6] Am. Compl. ¶ 13.

[7] Am. Compl. ¶ 29 & n.14.

3

designations for the Series B Preferred (the "Certificate").[8] The only relevant difference between the two securities is that the Series B Preferred Stock, as opposed to the Series A, is freely transferable.[9]

The Certificate sets forth the "designations, preferences, relative, participating, optional and other special rights and the qualifications, limitations and restrictions" of the Series B Preferred Stock. Absent special circumstances expressly set forth in the Certificate or as required by law, the Series B Holders have no voting rights.[10] Upon the occurrence of a Voting Rights Triggering Event ("VRTE"), however, certain rights, voting and otherwise, do arise.[11] A VRTE occurs, among other times, when:

- Dividends on outstanding Series B Preferred Stock are in arrears and unpaid for four consecutive quarterly dividend periods;

- SBS fails to discharge any redemption or repurchase obligation with respect to the Series B Preferred Stock;

- SBS breaches or violates any covenants or agreements in Section 11 of the Certificate (addressed further below); and

- SBS defaults under any indenture by failing to pay principal or interest.[12]

---

[8] Am. Compl. ¶ 29 n.14; Ex. B.

[9] Am. Compl. ¶ 29 n.14.

[10] Am. Compl. Ex. B §§ 9(a), 15.

[11] Am. Compl. Ex. B § 9(b).

[12] Am. Compl. Ex. B § 9(b)(i)-(ii), (iv)-(v).

4

When a VRTE occurs, the number of directors constituting SBS's board is increased to permit the Series B Holders to elect two additional members.[13] Additionally, for as long as a VRTE continues, the Company is prohibited from making certain "Restricted Payments" to "Junior Securities," as defined in the Certificate, and SBS may not enter into certain types of transactions, such as mergers or consolidations.[14] Most importantly for the present action is that the Certificate bars SBS from incurring Indebtedness during a VRTE without the consent of the Series B Holders.[15] The definitions of "incur" and "Indebtedness," which are central to this action, are discussed later in this opinion.

Absent a VRTE, SBS can incur Indebtedness if the Company's "Debt to Cash Flow Ratio" is no greater than 7.0 to 1.0 at the time of incurrence of such Indebtedness.[16] This Debt to Cash Flow Ratio restriction does not apply, however, to twelve enumerated categories of "Permitted Debt," which are obligations that SBS may incur as long as there is no VRTE in effect.[17]

---

[13] Am. Compl. Ex. B § 9(b)(v).

[14] Am. Compl. Ex. B §§ 11(a), (c).

[15] Am. Compl. ¶ 4; Ex. B § 11(b).

[16] Am. Compl. Ex. B § 11(b).

[17] Am. Compl. Ex. B § 11(b).

5

### C. The Senior Notes

In February 2012, SBS issued $275 million in principal amount of Senior Notes pursuant to the Senior Secured Notes Indenture (the "Indenture").[18] The Senior Notes are secured by substantially all of the Company's assets, and approximately $260 million in face value of the Senior Notes are currently outstanding.[19] Under the Indenture, the Senior Notes became due and payable in full on April 17, 2017.[20]

Before the Senior Notes due date, the Indenture required the Company to pay interest on the Senior Notes semi-annually in arrears on April 15 and October 15 of each year.[21] After the Senior Notes due date, if the Senior Notes are overdue, SBS must make interest payments "from time to time on demand at the interest rate on the [Senior] Notes."[22]

---

[18] Transmittal Aff. of Matthew P. Majarian ("Majarian Aff.") Ex. 2 at 1 (Dkt. 13); Am. Compl. ¶ 5 & n.6.

[19] Am. Compl. ¶ 5 n.6; Majarian Aff. Ex. 3 at 5.

[20] Am. Compl. ¶ 5.

[21] Majarian Aff. Ex. 2 at A-5.

[22] *Id.*

### D. Multiple VRTEs Have Occurred and are Uncured by SBS

The Company "encountered financial difficulties as a result of the 2008 recession and its financial position has since deteriorated."[23] Consequently, a number of VRTEs have occurred since then and remain uncured because the Company does not "currently have sufficient funds legally available to it to be able to satisfy the conditions for terminating them."[24]

A VRTE was triggered in April 2009 when the Company stopped paying dividends to the Series B Holders.[25] As of September 30, 2017, SBS owed approximately $72.6 million in accrued and unpaid dividends to the Series B Holders, an amount that continues to grow.

A second VRTE occurred on October 15, 2013, when a majority of the Series B Holders exercised their right to require SBS to repurchase their preferred stock at $1,000 per share, but the Company failed to do so.[26] Due to a lack of legally available funds, SBS only repurchased 1,800 of the 92,223 shares for which holders exercised their repurchase rights.[27] The Series B Holders thereafter exercised their

---

[23] Def.'s Opening Br. 1 (Dkt. 13).

[24] Am. Compl. ¶ 45 (quoting SBS, Quarterly Report (Form 10-Q) (Nov. 14, 2017) at 19).

[25] Am. Compl. ¶ 46 & n.33.

[26] Am. Compl. ¶ 47; Ex. B §§ 7(a), 9(b)(ii).

[27] Am. Compl. ¶ 47.

right to elect two additional directors to the Company's Board.[28]   SBS has acknowledged the occurrence and continuance of this VRTE in its public filings, including its quarterly report dated November 14, 2017.[29]

A third VRTE occurred on the Senior Notes due date, April 17, 2017, when SBS failed to pay off the Senior Notes and an Event of Default arose under the Indenture.[30]  To avoid a foreclosure on the assets secured by the Senior Notes—which are all or substantially all of SBS's assets—SBS executed a forbearance agreement with holders of approximately 75% of the outstanding Senior Notes, dated May 8, 2017 (the "Forbearance Agreement," and such forbearing holders, the "Forbearing Noteholders").[31]  The plaintiffs in this action who also hold Senior Notes are not among the Forbearing Noteholders.[32]

The Forbearance Agreement provided, in relevant part, that the Forbearing Noteholders would forbear from exercising any of their rights and remedies under the Indenture with respect to SBS's failure to repay the Senior Notes until May 31,

---

[28] Am. Compl. ¶ 42.  According to plaintiffs, "the two Series B-elected board members recently resigned—upon information and belief—because of frustration over SBS's failure to pursue a right-sizing of its capital structure in good faith."  *Id.*

[29] Am. Compl. ¶ 47.

[30] Am. Compl. ¶¶ 5, 48; Ex. B § 9(b)(v); Majarian Aff. Ex. 2 § 6.01(a)(1).

[31] Am. Compl. ¶ 6; Majarian Aff. Ex. 1 at 1.

[32] Am. Compl. ¶ 6 n.7.

2017.[33]  In exchange, SBS agreed to:  (i) make two monthly interest payments to the holders of the Senior Notes (as opposed to paying interest on a semi-annual basis as set forth in the Indenture), totaling approximately $2.9 million each month;[34] (ii) pay a one-time consent fee to the Forbearing Noteholders equal to 0.35% of their outstanding principal;[35] and (iii) pay the Forbearing Noteholders' legal and financial advisor fees.[36]  The Forbearance Agreement did not purport to amend the Indenture or change any term of the Senior Notes.[37]

The Forbearance Agreement expired on May 31, 2017, with the Senior Notes remaining unpaid and outstanding.[38]  Although it does not have a new formal agreement with the Forbearing Noteholders, SBS has continued to make monthly interest payments on the Senior Notes and to pay the Forbearing Noteholders' advisor fees.[39]  The holders of the Senior Notes, in turn, have not accelerated the principal amount of their debt or commenced related legal proceedings.[40]

---

[33] Am. Compl. ¶¶ 6-7; Majarian Aff. Ex. 1 §§ 2.01, 2.02.

[34] Am. Compl. ¶ 6; Majarian Aff. Ex. 1 § 4.01(b).

[35] Am. Compl. ¶ 6; Majarian Aff. Ex. 1 § 4.02.

[36] Am. Compl. ¶ 6; Majarian Aff. Ex. 1 § 4.04.

[37] Majarian Aff. Ex. 1 §§ 1.01(d), (f).

[38] Am. Compl. ¶¶ 5, 7.

[39] Am. Compl. ¶ 7 (citing SBS, Quarterly Report (Form 10-Q) (Nov. 14, 2017) at 16).

[40] Am. Compl. ¶ 50.

**E. SBS Suspends the Series B Holders' Rights**

On November 2, 2017, plaintiffs filed their initial complaint in this action, the thrust of which was that SBS breached the Certificate by impermissibly incurring debt during a VRTE by "extending, refinancing or renewing" the Senior Notes with the Forbearance Agreement.[41] After reviewing the initial complaint, SBS claimed that it learned for the first time that "the collective ownership of non-U.S. entities exceeds 63 percent of the outstanding Series B Preferred Shares,"[42] an amount that the Company says "exceeds the limitations on foreign ownership set forth in Section 310" of the Communications Act and in Article X of SBS's Third Amended and Restated Certificate of Incorporation (the "Charter").[43]

Section 310(b)(4) of the Communications Act establishes "a 25 percent benchmark for investment by foreign individuals, governments and corporations in U.S.-organized entities that directly or indirectly control a U.S. broadcast . . . license."[44] Article X of the Charter incorporates the Communications Act's alien ownership restrictions, purportedly "to enact protocols or undertake actions to remain in compliance with the requirements of the [Communications] Act."[45]

---

[41] Compl. ¶¶ 58-65 (Dkt. 1).

[42] Am. Compl. ¶ 64 (quoting SBS, Current Report (Form 8-K) (Nov. 28, 2017), Ex. 4.1).

[43] Am. Compl. Ex. C at 1.

[44] Am. Compl. ¶ 64 (citation and internal quotations omitted and alterations in original).

[45] Am. Compl. Ex. C at 2.

On November 28, 2017, SBS announced that it had suspended all Series B Holders' rights as stockholders "other than [the] right to transfer [] shares to a citizen of the United States."[46] SBS asserted it did this "to ensure that transfers of Series B Preferred Shares that have been completed in violation of the [Communications] Act and the Certificate of Incorporation do not adversely affect its FCC broadcast licenses and ability to continue its business operations."[47]

The Company has stated that the suspension of rights will remain in place with respect to each Series B Holder until SBS has concluded that: (i) the shares of such holder should be treated as not owned by a foreign entity; or (ii) the total ownership distribution of the Series B Preferred Stock complies with the requirements of the Communications Act and the Charter.[48] According to SBS, a single Domestic Share Certificate represented all of the issued and outstanding Series B Preferred Stock.[49] SBS cancelled that single Domestic Share Certificate

---

[46] Am. Compl. ¶ 63 (alterations in original and quoting SBS, Current Report (Form 8-K) (Nov. 28, 2017), Ex. 4.1).

[47] SBS, Current Report (Form 8-K) (Nov. 28, 2017), Ex. 4.1.

[48] *Id.*

[49] Def.'s Reply Br. 26 (Dkt. 17).

11

representing the Series B Preferred Stock,[50] and announced publicly on March 26, 2018, that "it has not yet issued foreign share certificates evidencing such stock."[51]

### F. The FCC Proceeding

On December 8, 2017, plaintiffs' counsel sent SBS a letter explaining its belief that the Communications Act had not been violated on account of the nationalities of the Series B Holders and that the Federal Communications Commission (the "FCC") was likely to grant a declaratory ruling to that effect.[52] Plaintiffs also provided certain ownership information regarding the holders of the Series B Preferred Stock and offered "to consult with the FCC staff and file a petition for declaratory ruling" to establish that SBS was in compliance with the alien ownership restrictions of the Communications Act.[53] Unbeknownst to plaintiffs, SBS already filed a petition with the FCC on December 4, 2017, seeking a declaration that the Company was in compliance with the Communications Act after having suspended the Series B Holders' rights.[54]

---

[50] Am. Compl. ¶ 63.

[51] Letter from R. Saunders, Esq. (Apr. 2, 2018) at 4 & Ex. 1 (SBS, Current Report (Form 8-K) (Mar. 26, 2018), Item 8.01) (Dkt. 18).

[52] Am. Compl. ¶ 66; Ex. D.

[53] Am. Compl. ¶ 66; Ex. D at 6.

[54] Am. Compl. ¶ 67.

On January 25, 2018, while SBS's FCC petition was being briefed, the FCC issued a letter indicating that the petition "does not provide enough information for [the FCC] to proceed with a comprehensive review or to address SBS's prayer for relief."[55] As a result, the FCC deferred ruling on SBS's position until February 26, 2018 or until SBS could provide additional information to the FCC.[56] The letter also clarified that "SBS will not be required to redeem the non-compliant foreign interest or to remedy the non-compliance while its [petition] is pending," but "it must have a mechanism in place to come into compliance within thirty (30) days following an adverse decision on its [petition]."[57] The FCC noted that it "take[s] no position on the outcome of any issue in" this Delaware action and "defer[s] to the Court and its conclusions."[58]

## II.    PROCEDURAL HISTORY

Plaintiffs' initial complaint, filed on November 2, 2017, asserted three claims. After SBS moved to dismiss that complaint on November 27, 2017, and purported to suspend the rights of the Series B Holders the next day, plaintiffs filed the Amended Complaint on December 22, 2017, adding two additional claims.

---

[55] Pls.' Answering Br. Ex. 1 at 3 (Dkt. 14).

[56] *Id.* at 5.

[57] *Id.* at 4.

[58] *Id.* at 3 n.17.

Counts I-III assert claims relating to the Certificate. Count I asserts that SBS breached the Certificate by "extending, refinancing, or renewing" the Senior Notes with the Forbearance Agreement.[59] Count II asserts that the Company breached the Certificate's implied covenant of good faith and fair dealing. Count III seeks the remedy of specific performance.

Counts IV and V assert claims relating to the Charter. Count IV asserts that SBS breached Section 10.4 of the Charter by suspending the rights of the Series B Holders.[60] Count V seeks a declaratory judgment that Section 10.4 of the Charter is invalid and unenforceable under Delaware law.

On January 2, 2018, SBS filed a motion to dismiss the Amended Complaint in its entirety under Court of Chancery Rules 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim for relief. At the conclusion of argument on the motion held on April 12, 2018, the court requested supplemental briefing on: (i) the appropriate means of resolving any ambiguity in the Certificate provisions at issue; and (ii) the application of Generally Accepted Accounting Principles ("GAAP") to certain items at issue in this action for purposes of the Certificate's requirement (discussed below) that, to qualify as "Indebtedness," an

---

[59] Am. Compl. ¶¶ 73-80.

[60] Am. Compl. ¶¶ 92-93.

item must appear as a liability on a balance sheet prepared in accordance with GAAP.[61]  Supplemental briefing was completed on May 1, 2018.

## III.  ANALYSIS

The claims in the Amended Complaint fall into two discrete categories:  (i) claims concerning the alleged incurrence of Indebtedness (the Certificate claims); and (ii) claims concerning the suspension of certain rights of the Series B Holders (the Charter claims).  Discussion of each category is divided between Sections A and B, respectively.

SBS seeks dismissal of all claims under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.  The standards governing such a motion are well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[62]

With respect to one of the Charter claims (Count V), SBS also seeks dismissal under Court of Chancery Rule 12(b)(1) for lack of ripeness.  The standards governing such a motion are discussed below in the analysis of Count V.

---

[61] Tr. 121-24 (Apr. 12, 2018) (Dkt. 25).

[62] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

## A. The Certificate Claims

The Certificate claims comprise Counts I, II, and III of the Amended Complaint. They are discussed below in that order.

### 1. Plaintiffs Have Stated a Claim for Breach of Contract

Count I asserts that SBS breached Section 11(b) of the Certificate by "extending, refinancing, or renewing" the Senior Notes with the Forbearance Agreement while a VRTE was in effect.[63] "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[64]

"The rules of construction which are used to interpret contracts and other written instruments are applicable when construing corporate charters and certificates of designation."[65] "The starting point in construing any contract is to determine whether a provision is ambiguous, *i.e.*, whether it is *reasonably* subject to more than one interpretation."[66] "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[67] "It is well

---

[63] Am. Compl. ¶¶ 73-80.

[64] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) (citation omitted).

[65] *Matulich v. Aegis Commc'ns Grp., Inc.*, 942 A.2d 596, 600 (Del. 2008) (citation omitted).

[66] *Id.* (citation omitted and emphasis in original).

[67] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

established that a court interpreting any contractual provision, including preferred stock provisions, must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."[68] "If no ambiguity is present, the Court must give effect to the clear language of the Certificate."[69] When a contract is "fairly susceptible of different interpretations"[70] and is therefore ambiguous, "the court must turn to secondary methods of interpretation."[71]

The analysis of Count I boils down to essentially one question: has SBS "incurred Indebtedness," as those terms are defined in the Certificate, during the pendency of a VRTE in violation of Section 11(b) of the Certificate? I begin by quoting the relevant part of Section 11(b), which defines the term "incur," and the separate definition of Indebtedness.

> Section 11(b) of the Certificate provides, in relevant part, as follows:
>
> > The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (*collectively "incur"*) any Indebtedness . . . provided, however, that, so long as no Voting Rights Triggering Event has occurred and is continuing, the Company may incur Indebtedness . . . if, in each case, the Company's Debt to Cash

---

[68] *Elliot Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998) (citation omitted).

[69] *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996) (citation omitted).

[70] *Id.* (citation omitted).

[71] *Shiftan v. Morgan Joseph Holdings, Inc.*, 57 A.3d 928, 935 (Del. Ch. 2012) (Strine, C.).

Flow Ratio at the time of incurrence of such Indebtedness . . . would have been no greater than 7.0 to 1.0.

So long as no Voting Rights Triggering Event shall have occurred and be continuing or should be caused thereby, the provisions of the first paragraph of this Section 11(b) will not apply to the incurrence of any of the following (*collectively, "Permitted Debt"*).[72]

The term "Permitted Debt" is defined to include twelve different categories of obligations. One of several items listed in the eighth category is "the accrual of interest."[73]

The complete definition of Indebtedness is set forth below, with the portions relevant to Count I emphasized:

"Indebtedness" means, with respect to any Person, without duplication, (i) *any indebtedness of such Person, whether or not contingent, in respect of borrowed money or evidenced by bonds, notes, debentures or similar instruments* or letters of credit (or reimbursement agreements in respect thereof) or banker's acceptances or representing Capital Lease Obligations or the balance deferred and unpaid of the purchase price of any property or representing any Hedging Obligations, except any such balance that constitutes an accrued expense or trade payable, *if and to the extent any of the foregoing indebtedness* (other than letters of credit and Hedging Obligations) *would appear as a liability upon a balance sheet of such Person prepared in accordance with GAAP*, (ii) all indebtedness of others secured by a Lien on any asset of such Person (whether or not such indebtedness is assumed by such Person) and (iii) to the extent not otherwise included, the guarantee by such Person of any indebtedness of any other Person of the sort described in clause (i) of this definition. Notwithstanding the foregoing, the term "Indebtedness" shall not include Non-Recourse Debt or indebtedness that constitutes

---

[72] Am. Compl. Ex. B § 11(b) (emphasis added).

[73] Am. Compl. Ex. B § 11(b).

18

"Indebtedness" merely by virtue of a pledge of Equity Interests of an Unrestricted Subsidiary. Furthermore, for the avoidance of doubt, "Indebtedness" shall not include any Capital Stock or any liabilities in respect of Capital Stock. ***The amount of any Indebtedness outstanding as of any date shall be*** (A) the accreted value thereof, in the case of any Indebtedness issued with original issue discount, (B) the principal amount of the Indebtedness secured, together with any interest thereon that is more than 30 days past due, in the case of any Indebtedness of the type described in clause (ii) above, (C) the principal amount of the Indebtedness guaranteed, together with any interest thereon that is more than 30 days past due, in the case of any Indebtedness of the type described in clause (iii) above, (D) the amount of the net settlement payment payable on termination, in the case of any Indebtedness constituting a Hedging Obligation (assuming for this purpose that the Hedging Obligation was terminated on the date as of which the calculation of the amount of Indebtedness is being made), and ***(E) the principal amount thereof, together with any interest thereon that is more than 30 days past due, in the case of any other Indebtedness.***[74]

The first sentence of the definition of Indebtedness is divided into three clauses. Plaintiffs' argument focuses only on the first clause, which has two parts, and which implicates the last clause of the last sentence. Thus, the Certificate's definition of Indebtedness relevant to plaintiffs' claims has essentially three components. First, under clause (i), Indebtedness means "any indebtedness of such Person, whether or not contingent, in respect of borrowed money or evidenced by bonds, notes, debentures or similar instruments."[75] Second, to qualify as

---

[74] Am. Compl. Ex. B at 8 (emphasis added).

[75] Am. Compl. Ex. B at 8.

Indebtedness under clause (i), an item also must "appear as a liability upon a balance sheet of such Person prepared in accordance with GAAP."[76] Third, "the amount of any Indebtedness outstanding as of any date" includes "the principal amount thereof, together with any interest thereon that is more than 30 days past due, in the case of any other Indebtedness."[77]

Seemingly ignoring the component of the definition of Indebtedness in clause (i) that requires it to be recorded as a liability on a GAAP-compliant balance sheet, plaintiffs initially argued that a host of payments and obligations associated with the Senior Notes and the Forbearance Agreement constituted impermissible incurrences of Indebtedness during a VRTE.[78] When responding to the court's request for supplemental submissions, however, plaintiffs narrowed their contentions and identified only two categories of SBS's obligations they argue would appear as a liability on a balance sheet prepared in accordance with GAAP such that they would qualify as Indebtedness under clause (i) of the definition quoted above: (i) accrued but unpaid interest on the Senior Notes, and (ii) accrued but unpaid professional fees associated with the Senior Notes and the Forbearance Agreement.[79] I address each category in turn.

---

[76] Am. Compl. Ex. B at 8.

[77] Am. Compl. Ex. B at 8.

[78] *See* Pls.' Answering Br. 17-25.

[79] Pls.' Suppl. Br. 1-2 (Dkt. 23).

### a. Plaintiffs' Accrued Interest Allegations Satisfy the First Two Elements of a Breach of Contract Claim

The logic of plaintiffs' argument with respect to accrued but unpaid interest on the Senior Notes goes as follows. Plaintiffs start with the general rule in paragraph one of Section 11(b) that there is an absolute restriction on incurring Indebtedness. As plaintiffs point out, however, the latter part of that paragraph permits the incurrence of Indebtedness so long as there is no pending VRTE and the Company's Debt to Cash Flow Ratio does not exceed 7.0 to 1.0.

Plaintiffs next move to paragraph two of Section 11(b), which provides a further exception to the prohibition on incurring Indebtedness. More specifically, paragraph two allows SBS to incur twelve enumerated forms of "Permitted Debt" so long as no VRTE is in place, without regard to SBS's Debt to Cash Flow Ratio. From this premise, plaintiffs reason that, because SBS *cannot* incur any Permitted Debt when a VRTE is in effect, the twelve categories of Permitted Debt are examples of Indebtedness. As noted above, one type of "Permitted Debt" includes "the accrual of interest."[80] Thus, according to plaintiffs, *any accrual of interest* is a type of Permitted Debt, which in turn is a subset of Indebtedness that cannot be incurred during a VRTE. Plaintiffs argue further that the constant accrual of interest meets

---

[80] Am. Compl. Ex. B § 11(b)(viii).

the Certificate's definition of "incurring" a form of Indebtedness, since the term "incur" is defined broadly.[81]

The Company concedes that accrued but unpaid interest on the Senior Notes would appear as a liability on a GAAP-compliant balance sheet,[82] but argues that the fatal flaw in plaintiffs' theory is that, for accrued interest to qualify as Indebtedness, the Certificate requires that the interest is "more than 30 days past due."[83] For support, SBS points to one of the parts of the definition of Indebtedness emphasized above; namely, that the calculation of the amount of SBS's Indebtedness outstanding at any given time includes the principal amount plus interest on the principal "that is more than 30 days past due."[84] In other words, SBS's position is that this definition recognizes that interest can be "Indebtedness," but only when payment on interest is more than thirty days in arrears.

The key difference between the parties' positions, in short, is that plaintiffs argue that *any accrual of interest* constitutes Indebtedness through inverse reasoning based on the structure of Section 11(b), while SBS argues that only *certain accrued interest* (*i.e.*, interest more than 30 days past due) constitutes Indebtedness based on

---

[81] Pls.' Answering Br. 10.

[82] Def.'s Suppl. Br. 12 n.10 (Dkt. 24).

[83] Am. Compl. Ex. B at 8.

[84] Am. Compl. Ex. B at 8 (emphasis added).

22

text in the paragraph of the Certificate that defines the term Indebtedness. Although SBS's reliance on the paragraph that specifically defines Indebtedness intuitively seems like a sensible way to resolve the conflict,[85] I cannot rule out at the pleadings stage that both interpretations are reasonable and thus find that the Certificate is ambiguous.[86] Reinforcing the ambiguity is that the "30 days past due" qualification does not appear in the part of the paragraph that actually *defines* the term Indebtedness, but rather in the part that *calculates the amount* of Indebtedness outstanding. As plaintiffs argue, a means of *quantifying* the amount of Indebtedness does not necessarily rule out that other things may *qualify* as Indebtedness. Having found the existence of ambiguity, the next question is what to do about it given that the instrument at issue is a certificate of designations.

---

[85] *See DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) (citation omitted) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[86] SBS also argues that plaintiffs' position would lead to "absurd results" because an actionable breach of the Certificate would occur immediately upon the pendency of a VRTE whenever SBS has outstanding debt because some interest necessarily would be accrued for some period of time. Plaintiffs, however, proffer a response to which the Company did not respond, *i.e.*, that the Series B Holders "bargained" for a seat at the table when SBS has fallen behind on its debt. I cannot say as a matter of law that plaintiffs' position is one "that no reasonable person would have accepted when entering the contract." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (citation omitted).

As Chief Justice Strine, writing as Chancellor, commented in *Shiftan v. Morgan Joseph Holdings, Inc.*, things become "a bit more complicated" when a certificate of designations is "fairly susceptible of different interpretations."[87]  In a typical case, a breach of contract claim survives a motion to dismiss where the relevant provisions are ambiguous, because usually "any ambiguity must be resolved in favor of the nonmoving party."[88]  Thereafter, "a court normally will consider extrinsic evidence of the parties' contractual intent."[89]

Parol evidence, however, may not be illuminative of the parties' reasonable expectations in the context of certificates of designations because, for example, "important parties in interest—the holders of the securities—were neither consulted about, nor involved in the drafting of," the contract.[90]  And even if such evidence

---

[87] *Shiftan*, 57 A.3d at 935.

[88] *Kahn v. Portnoy*, 2008 WL 5197164, at *3 (Del. Ch. Dec. 11, 2008).

[89] *Bank of New York Mellon v. Commerzbank Capital Funding Tr. II*, 65 A.3d 539, 551 (Del. 2013) (citation omitted).

[90] *Id.*; *see also Kaiser,* 681 A.2d at 397-98 (citations and internal quotations omitted) ("[S]uch an investigation would reveal information about the thoughts and positions of, at most, the issuer and the underwriter. . . .  Since these sorts of provisions are . . . not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the party to an indenture, evidence of the course of negotiations would not be helpful."); *Shiftan*, 57 A.3d at 935 (citations omitted) ("In the case of documents like certificates of incorporation or designation, the kinds of parol evidence frequently available in the case of warmly negotiated bilateral agreements are rarely available.  Investors usually do not have access to any of the drafting history of such documents, and must rely on what is publicly available to them to understand their rights as investors.  Thus, the subjective, unexpressed views of entity managers and the drafters

exists, courts are "reluctant to risk disuniformity by adverting to evidence of the course of negotiation in a setting in which the same language can be found in many different contracts."[91]  Thus, in the context of resolving ambiguities with respect to preferred stock, Delaware courts often have resorted to two alternative interpretive principles that, as the court noted in *Shiftan*, are "arguably . . . in tension with another."[92]

One method of interpretation, which plaintiffs argue is controlling here, is the doctrine of *contra proferentem*, which resolves ambiguities in a certificate of designations in favor of investors in preferred stock.[93]  Our Supreme Court referred to the doctrine in *Kaiser Aluminum Corp. v. Matheson* as one of "last resort [to be applied where] the language of the certificate presents a hopeless ambiguity, particularly when alternative formulations indicate that these provisions could easily have been made clear."[94]  Despite this caution, it has invoked *contra proferentem* to

---

who work for them about what a certificate means has traditionally been of no legal consequence, as it is not proper parol evidence as understood in our contract law.").

[91] *Kaiser*, 681 A.2d at 398.

[92] *Shiftan*, 57 A.3d at 936.

[93] *Kaiser*, 681 A.2d at 398-99.

[94] *Id*. at 399 (citation omitted).

resolve ambiguities about the rights of investors in the governing instruments of business entities on a number of occasions.[95]

The second method of construction, which SBS argues is controlling here, was articulated by our Supreme Court in *Rothschild International Corp. v. Liggett Group Inc.*[96] There, the high court explained that "[p]referential rights are contractual in nature and therefore are governed by the express provisions of a company's certificate of incorporation. Stock preferences must also be clearly expressed and will not be presumed."[97] This is because "stock preferences are in derogation of the common law,"[98] so "[a]ny rights, preferences and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated, as provided by statute."[99] The upshot of this principle is that courts

---

[95] *See, e.g.*, *Commerzbank*, 65 A.3d at 551-52 (applying the principle to discern the meaning of "Parity Securities" in an LLC Agreement); *Penn. Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1149-50 (Del. 1997) (citation omitted) ("It is the obligation of . . . the issuer of securities to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the documents. Thus, if the contract in such a setting is ambiguous, the principle of *contra proferentem* dictates that the contract must be construed against the drafter."); *Kaiser*, 681 A.2d at 398 (applying the "well-accepted principle that ambiguities in a contract should be construed against the drafter" to construe preferred stockholders' conversion rights under a certificate of designations).

[96] 474 A.2d 133 (Del. 1984).

[97] *Id*. at 136 (citation omitted).

[98] *Waggoner v. Laster*, 581 A.2d 1127, 1134 (Del. 1990) (citation omitted).

[99] *Elliot Assocs.*, 715 A.2d at 852 (citing 8 *Del. C.* § 151(a)).

26

have been unwilling to recognize or read in implied rights, preferences, or limitations in certificates of designations.[100]

Chief Justice Strine described the potential clash of these two interpretive principles in *Shiftan*:

> One could argue that these interpretive principles come into direct conflict in a very particular context. Imagine a situation where preferred stockholders argue that a certificate of designation can be reasonably read to grant a particular preference. The court agrees, but also agrees with the corporation that the relevant provision in the certificate is not clear. There is no parol evidence on the subject. Do the preferred stockholders win because of *contra proferentem*? Or does the corporation win because preferences of preferred stock "will not be presumed" unless they are clearly expressed in the certificate?[101]

He ultimately "side-stepped" this issue because he found the relevant provision not to be ambiguous,[102] but noted that, had he found ambiguity, he *would* have been willing to consider probative extrinsic evidence:

> The principle that the preferences of preferred stockholders must not be presumed, but rather be clearly expressed, does not, it seems to me, prevent a court from consulting parol evidence, if that is available. *Avatex* itself seemed to require this resolution, as it suggested that the prior decision of *Waggoner v. Laster*, which identified "strict construction" as the analytical methodology for interpreting stock preferences, was problematic. *Avatex*, and cases like *Kaiser*, which did

---

[100] *See, e.g.*, *Waggoner*, 581 A.2d at 1135; *Rothschild*, 474 A.2d at 136; *Benchmark Capital Partners IV, L.P. v. Vague*, 2002 WL 1732423, at \*13-14 (Del. Ch. July 15, 2002), *aff'd sub nom. Benchmark Capital Partners IV, L.P. v. Juniper Fin. Corp.*, 822 A.2d 396 (Del. 2003) (TABLE).

[101] 57 A.3d at 937 (citing *Rothschild*, 474 A.2d at 136).

[102] *Id*. at 937-38.

not mention any requirement of strict construction, therefore suggest to me that this disciplinary principle of narrow interpretation of stock preferences is not intended to blind a court to all relevant evidence, but instead to prevent the judiciary from implying or presuming preferences without a clear basis for doing so. In other words, unless the parol evidence resolves the ambiguity with clarity in favor of the preferred stock, the preferred stockholders should lose.[103]

I agree with the *Shiftan* court's reasoning with respect to the consideration of parol evidence. In my view, the parties should be permitted to develop a factual record to see if any probative extrinsic evidence exists of the parties' shared beliefs about the meaning of "incurring Indebtedness." As an example, information that SBS used to market the Series B Preferred Stock may provide helpful evidence of (i) what the issuer believed when it authorized the preferred stock, and (ii) what the investors should have reasonably believed that they were purchasing.[104] Ultimately, such evidence may not exist and the court will need to determine the meaning of the Certificate through the application of interpretive principles, but I need not resolve that issue now.

---

[103] *Id.* (citations omitted); *see also id.* at 938 n.28 (admitting "to having a harder time reconciling" the two interpretive principles "when no parol evidence is available" and explaining "[m]aking [the] decision [who wins] more difficult is the fact that other investors rely on the certificate and other publicly available documents describing the certificate, and granting rights to the preferred stock on the basis of an ambiguous certificate could disrupt the reasonable expectations of the other investors").

[104] *Id.* at 940.

To summarize, because I have found the Certificate to be ambiguous, and because I do not read the *Kaiser* line of cases[105] or the *Rothschild* line of cases as precluding the court from considering probative parol evidence, if it exists, when interpreting a preferred stock instrument, I conclude that plaintiffs' accrued interest theory satisfies the first two elements of a contract claim, *i.e.*, the existence of a contractual obligation and breach of that obligation by defendant.

### b. Plaintiffs' Accrued Professional Fees Allegations Satisfy the First Two Elements of a Breach of Contract Claim

Plaintiffs' second theory for how SBS violated Section 11(b) of the Certificate can be addressed in short order.[106] Plaintiffs contend that professional fees the Company incurred in connection with obtaining the Forbearance Agreement are "indebtedness . . . in respect of borrowed money"[107] because these obligations arose in conjunction with the Senior Notes and the Forbearance Agreement, and that the accrual of such obligations should be recorded as liabilities on a GAAP-compliant balance sheet.[108]

---

[105] Indeed, the *Kaiser* court stated that "[w]e caution against this principle [*i.e.*, *contra proferentem*] becoming a short-cut for avoiding the sometimes difficult tasks of determining expectations." 681 A.2d at 399 (citation and internal quotations omitted).

[106] *See, e.g.*, Am. Compl. ¶¶ 7, 50.

[107] Am. Compl. Ex. B at 8.

[108] Pls.' Suppl. Br. 2.

29

I agree that this theory, to which the Company has offered no substantive response, also satisfies the first two elements of a contract claim given the broad terms of the definition of Indebtedness quoted above and given that the professional fees in question were incurred to procure a Forbearance Agreement relating to the Senior Notes. Whether the Company actually accrued such fees and whether their accrual would be recorded as a liability on a GAAP-compliant balance sheet are fact issues appropriate for discovery.

### c. Plaintiffs Have Alleged a Cognizable Theory of Compensable Damages

The Company argues that "[e]ven if Plaintiffs had adequately alleged a breach of the Certificate, their claims would still fail as a matter of law because Plaintiffs have not alleged any cognizable theory of damages."[109] SBS contends this is so because plaintiffs have alleged that the Company does not have sufficient funds to pay off even the Senior Notes and thus, had the holders of the Senior Notes refused to enter into the Forbearance Agreement and foreclosed on SBS's assets, the Series B Preferred Stock would be worthless.[110]

As an initial matter, this argument is based on a *hypothetical*, *i.e.*, what the Series B Holders *would have* recovered *had* the holders of the Senior Notes

---

[109] Def.'s Opening Br. 41.

[110] *Id.* at 42.

foreclosed. There has been no foreclosure, however, and it is reasonably conceivable from the facts pled that plaintiffs could establish compensable damages. For example, plaintiffs allege that the Senior Notes are trading above par value.[111] Thus, the possibility of a recovery for plaintiffs on their claims cannot be foreclosed.

The Company admits, furthermore, that "money damages in the form of a hypothetical consent fee could remedy a proven breach of the Certificate."[112] Thus, if plaintiffs establish that SBS breached the Certificate, a potential recovery for plaintiffs could be how much the Company would have had to pay the Series B Holders for their permission to incur Indebtedness with respect to the Senior Notes during the pendency of a VRTE.[113] The court expresses no opinion whether such a measure of damages would be appropriate, but provides this illustration simply to demonstrate another way that compensable damages are reasonably conceivable.[114]

---

[111] Am. Compl. ¶¶ 5, 51.

[112] Def.'s Opening Br. 43-44 (citing *Lehman Bros.*, 2014 WL 718430, at *8); *see also Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2013 WL 6327997, at *1 (Del. Ch. Dec. 4, 2013) (Strine, C.) (determining "damages based on [an] admittedly imperfect attempt to discern how a hypothetical negotiation would have occurred between [the issuer] and [the investor] over the consent").

[113] *See Fletcher*, 2013 WL 6327997, at *18 (citation omitted and emphasis in original) ("Consent rights are commonly viewed as protective devices meant to shield the holder of the rights against being harmed by a new transaction that is adverse to its interests," and when those rights are violated and the holder had some leverage in a hypothetical negotiation, "it is entitled to have its *reasonable* expectations honored").

[114] *See Delaware Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (citation omitted) ("The law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack

* * * * *

Based on the foregoing discussion, plaintiffs' allegations with respect to Count I satisfy the three elements of a contract claim and thus states a claim for relief. The next issue is whether SBS has advanced a defense that would preclude the claim at the pleadings stage as a matter of law.

### d. Adjudication of SBS's Acquiescence Defense Would be Premature

In its reply brief, the Company argued for the first time that, even if Count I states a claim for relief with respect to the accrual of interest, it should be barred by acquiescence.[115] According to SBS, "[n]othing about SBS's April 17, 2017 default on the [Senior] Notes altered how or in what amount interest accrued thereon; accordingly there are no new circumstances that would permit Plaintiffs to pursue a claim that arose (if at all) when a VRTE occurred in October 2013."[116]

To prevail on a defense of acquiescence, a defendant must show: "(1) the plaintiff remained silent (2) with knowledge of her rights (3) and with the knowledge or expectation that the defendant would likely rely on her silence, (4) the defendant knew of the plaintiff's silence, and (5) the defendant in fact relied to her detriment

---

mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages.").

[115] Def.'s Reply Br. 9-11.

[116] Def.'s Suppl. Br. 12 n.10.

32

on the plaintiff's silence."[117] "[A]ffirmative defenses . . . are not ordinarily well-suited for treatment on [a motion to dismiss]. Unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based on an affirmative defense is inappropriate."[118]

In *Lehman Brothers Holdings Inc. v. Spanish Broadcasting System, Inc.*, Vice Chancellor Glasscock granted summary judgment in SBS's favor based on an acquiescence defense where plaintiffs were holders of the very same Series B Preferred Stock at issue in this action. Specifically, he held that, assuming that a VRTE had occurred, plaintiffs acquiesced to two issuances of debt, including the issuance of the Senior Notes in February 2012.[119] The Vice Chancellor specifically enumerated the factors that formed the basis for his decision, including: (i) plaintiffs should have known (under their reading of the Certificate) that a VRTE was in effect; (ii) plaintiffs knew, or should have known, that SBS intended to enter into the debt transactions; (iii) plaintiffs raised no objections to the debt transactions, leading SBS to believe that plaintiffs acquiesced to the debt transactions; (iv) that belief was reasonable; (v) SBS entered into the debt transactions in reliance on plaintiffs'

---

[117] *Lehman Bros.*, 2014 WL 718430, at *10.

[118] *Reid v. Spazio*, 970 A.2d 176, 183-84 (Del. 2009) (citations omitted).

[119] 2014 WL 718430, at *12.

acquiescence; and (vi) if plaintiffs were permitted to pursue damages, SBS's reliance would be detrimental to the Company because "had the Plaintiffs notified SBS of their objections prior to the debt incurrence, SBS could have chosen for itself its lowest cost alternative for resolving the dispute."[120]

Although SBS ultimately may succeed on its defense of acquiescence to bar plaintiffs' claim that the accrual of interest constitutes an impermissible incurrence of debt, it would be premature to decide that issue now for essentially two reasons. First, plaintiffs have not had a full and fair opportunity to respond to this defense because the Company did not raise the argument until its reply brief.[121] Second, the court does not have a sufficient record to adjudicate the issue at this time.

As noted above, Vice Chancellor Glasscock's finding of acquiescence in *Lehman Brothers* was made in adjudicating a motion for summary judgment where the parties could present an appropriate factual record. Here, certain information necessary to decide an acquiescence defense is not before the court. For instance, the record does not reflect when the various plaintiffs in this action acquired their

---

[120] *Id.*

[121] *See Thor Merritt Square, LLC v. Bayview Malls LLC*, 2010 WL 972776, at *5 (Del. Ch. Mar. 5, 2010) (citations and internal quotations omitted) ("Under the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion. The failure to raise a legal issue in an opening brief generally constitutes a waiver of the ability to raise that issue in connection with a matter under submission to the court. Thus, courts routinely have refused to consider arguments made in reply briefs that go beyond responding to arguments raised in a preceding answering brief.").

Series B Preferred Stock. As such, no determination can be made whether they impermissibly remained silent for some period of time when they should have spoken up and disputed SBS's accrual of interest during a VRTE. In short, I cannot say that plaintiffs can prove no set of facts to avoid dismissal based on SBS's belated acquiescence defense.

### 2. Plaintiffs Have Failed to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Count II of the Amended Complaint asserts that the Company breached the Certificate's implied covenant of good faith and fair dealing by continuing "to improperly incur funded debt obligations" during a VRTE without plaintiffs' consent.[122]

The implied covenant "attaches to every contract,"[123] including certificates of designations,[124] and is "employed to analyze unanticipated developments or to fill gaps in [a] contract's provisions."[125] "Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create

---

[122] Am. Compl. ¶¶ 83-84.

[123] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (citation omitted).

[124] *See, e.g.*, *Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 833 (Del. Ch. 2006); *Gale v. Bershad*, 1998 WL 118022, at *4 (Del. Ch. Mar. 4, 1998).

[125] *Dunlap*, 878 A.2d at 441 (citations omitted); *see also Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (citation omitted) ("The implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider.").

a 'free-floating duty unattached to the underlying legal document.'"[126]  Thus, "the implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract."[127]  In my view, plaintiffs' implied covenant claim fails to state a claim for relief because plaintiffs have not identified a gap in the Certificate arising from an unanticipated development, but seek instead to rehash their request for relief in Count I.

As explained above with respect to the accrual of interest, the Certificate is ambiguous as to the meaning of "incur Indebtedness."  The fact that the contractual language is unclear, however, does not mean that a hole or gap exists in the Certificate for the implied covenant to fill.  Rather, as pled, plaintiffs' breach of the implied covenant claim is merely "an impermissible rehashing of plaintiffs' breach of contract claim."[128]  The "subject at issue"[129] here is what obligations SBS may incur during the pendency of a VRTE.  The Certificate expressly, albeit not

---

[126] *Dunlap*, 878 A.2d at 441 (citations and alterations omitted).

[127] *All. Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009) (Strine, V.C.) (citation omitted), *aff'd*, 976 A.2d 170 (Del. 2009) (TABLE).

[128] *US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *7 (Del. Ch. June 18, 2018) (citation omitted).

[129] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009) (citation and internal quotations omitted).

unambiguously in one respect, covers this issue—*i.e.*, the Company may not incur "Indebtedness" during a VRTE without the consent of the Series B Holders.

The "subject at issue" in Count II, furthermore, does not arise from some unanticipated development. Indeed, a number of factors demonstrate that the sorts of obligations that SBS would be able to incur at any given time were specifically considered, including the fact that the Certificate: (i) contains a general ban on the incurrence of Indebtedness, subject to certain quantitative (*i.e.*, a maximum 7.0 to 1.0 Debt to Cash Flow Ratio) and qualitative (*i.e.*, Permitted Debt) exceptions; (ii) specifically defines "incur" and "Indebtedness"; (iii) sets up a framework of what SBS can and cannot do during the pendency of a VRTE; and (iv) provides the Series B Holders certain governance rights during a VRTE.

In sum, Count II does not plead facts alleging a basis for relief independent of plaintiffs' breach of contract claim in Count I. Thus, the merits of plaintiffs' alleged contractual grievance must rise and fall with Count I.

### 3.    Plaintiffs' Request for Specific Performance is Viable in Part

Count III of the Amended Complaint seeks specific performance, requesting that the court "require compliance with the Certificate by prohibiting SBS from making any payments on account of the Senior Notes and requiring SBS to redeem the Series B Preferred Stock at face value plus accrued dividends."[130] Thus, the relief

---

[130] Am. Compl. ¶ 89.

that plaintiffs seek in Count III has two components, which seem at odds with each other on their face: (i) an order requiring SBS to respect the Series B Holders' consent rights; and (ii) an order requiring SBS to repurchase the Series Preferred B Stock. I address each request in turn.

"A remedy at law, i.e. money damages, will foreclose the equitable relief of specific performance when that remedy is 'complete, practical and as efficient to the end of justice as the remedy in equity, and is obtainable as [a matter] of right.'"[131] As explained above, Count I states a claim for breach of contract against SBS for impermissibly incurring Indebtedness. A possible measure of damages for that claim could be the amount of a hypothetical consent fee. At the motion to dismiss phase, however, plaintiffs are not precluded from pleading reasonably conceivable alternative remedies.[132] As Chief Justice Strine, writing as Chancellor, observed in *Fletcher International, Ltd. v. Ion Geophysical Corp.*, "consent rights cases are better dealt with by injunctive relief if the court can act with alacrity and give the parties a reasonable period to have the negotiation or work around the consent

---

[131] *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 437 (Del. Ch. 2007) (citation omitted).

[132] *See, e.g.*, *Bear Sterns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *15 (Del. Ch. Jan. 12, 2015) (permitting claims "framed alternatively in the language of damages, specific performance, and declaratory judgment" to survive a motion to dismiss).

rights."[133]  Accordingly, I am reluctant to foreclose a possible remedy at this stage of the case, and decline to do so with respect to plaintiffs' claims regarding the Company's alleged violation of the Series B Holders' consent rights.

Plaintiffs, however, are not entitled to an order requiring SBS to redeem the Series B Preferred Stock as a matter of law.  "Delaware courts have held consistently that preferred stock is equity, not debt."[134]  This is because "the holder of preferred stock is not a creditor of the corporation.  Such a holder has no legal right to annual payments of interest, as long term creditors will have, and most importantly has no maturity date with its prospect of capital repayment or remedies for default."[135]  "The existence of a mandatory redemption right, even one that has ripened, does not convert the holder of preferred stock into a creditor."[136]  "Authority spanning three different centuries adverts to and enforces limitations on the ability of preferred

---

[133] *Fletcher*, 2013 WL 6327997, at *19.

[134] *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *12 (Del. Ch. Apr. 14, 2017) (citation omitted).

[135] *HB Korenvas Invs., L.P. v. Marriott Corp.*, 1993 WL 205040, at *5 (Del. Ch. June 9, 1993) (Allen, C.).

[136] *Hsu*, 2017 WL 1437308, at *12.

stockholders to force redemption."[137]   A redemption right may be subject to statutory, common law, and contractual limitations.[138]

Section 7 of the Certificate granted the Series B Holders, on October 15, 2013, "the right to require the Company to repurchase (subject to the legal availability of funds therefor and to Section 170 of the DGCL) all or a portion of the Series B Preferred Stock held by such Holder" at a specified price and in accordance with certain procedures.[139]   Key to plaintiffs' claim here, the Series B Holders' redemption right is subject to contractual limitations, including "the legal availability of funds."   Plaintiffs recognize as much.   The Amended Complaint pleads that SBS was unable to repurchase all of the requested shares due to a lack of legally available funds,[140] and nowhere in the Amended Complaint have plaintiffs alleged that SBS violated the Certificate because it actually had greater legally available funds to repurchase additional Series B Preferred Stock.[141]

---

[137] *SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 990 (Del. Ch. 2010) (citation omitted).

[138] *Hsu*, 2017 WL 1437308, at *12.

[139] Am. Compl. Ex. B § 7(a).

[140] Am. Compl. ¶ 47.

[141] *Cf. Brevan Howard*, 2014 WL 2943570, at *8 (denying SBS's motion to dismiss because the complaint "adequately pleads that SBS breached the Series B Certificate by failing in its contractual obligations to undertake appropriate actions to determine what 'legally available funds' were at the Company's disposal as of October 15, 2013").

Plaintiffs' allegations, rather, stem from the Company's purported violation of the Certificate by incurring Indebtedness without the Series B Holders' consent during the pendency of a VRTE. Given the failure to even allege in the Amended Complaint a breach of the Company's buyback obligations in Section 7 of the Certificate, plaintiffs cannot be entitled to the remedy of specific performance as to that provision.

## B. Charter Claims

I now turn to plaintiffs' two claims regarding SBS's suspension of the rights of the Series B Preferred Stock under Section 10.4 of the Charter. For the reasons explained below, both claims survive the motion to dismiss.

### 1. Plaintiffs Have Stated a Claim for Breach of the Charter

Count IV of the Amended Complaint asserts that SBS "breached Section 10.4 of the Charter and improperly disenfranchised Plaintiffs" because SBS "unilaterally suspended all rights of the Series B Holders, 'other than [the] right to transfer [] shares to a citizen of the United States.'"[142]

Section 10.4 of the Charter—entitled "Limitation on Foreign Ownership" and to which I refer at times as the "Enforcement Provision"—states in its entirety the following:

> [1] Except as otherwise provided by law, not more than twenty-five percent of the aggregate number of shares of Capital Stock of the

---

[142] Am. Compl. ¶¶ 92-93.

Corporation outstanding shall at any time be owned of record by or for the account of aliens or their representatives or by or for the account of a foreign government or representatives thereof, or by or for the account of any corporation organized under the laws of a foreign country. [2] Shares of Capital Stock shall not be transferable on the books of the Corporation to aliens or their representatives, foreign governments or representatives thereof, or corporations organized under the laws of foreign countries if, as a result of such transfer, the aggregate number of shares of Capital Stock owned by or for the account of aliens and their representatives, foreign governments and representatives thereof, and corporation [sic] organized under the laws of foreign countries shall be more than twenty-five percent of the number of shares of Capital Stock then outstanding. [3] *If it shall be found by the Corporation that Capital Stock represented by a Domestic Share Certificate is, in fact, held by or for the account of aliens or their representative[s], foreign governments or representatives thereof, or corporations organized under the laws of foreign countries, then such Domestic Share Certificate shall be canceled and a new certificate representing such Capital Stock marked "Foreign Share Certificate" shall be issued in lieu thereof, but only to the extent that after such issuance the Corporation shall be in compliance with this ARTICLE X*; provided, however, that *if, and to the extent, such issuance would violate this ARTICLE X, then, the holder of such Capital Stock shall not be entitled to vote, to receive dividends, or to have any other rights with regard to such Capital Stock to such extent, except the right to transfer such Capital Stock to a citizen of the United States*.[143]

There are essentially two parts to Section 10.4. The first two sentences concern a 25% limitation on "alien" ownership of the Company's "Capital Stock." The term "alien" has the meaning ascribed to it by the FCC,[144] and the term "Capital

---

[143] Am. Compl. Ex. A § 10.4 (emphasis added).

[144] Am. Compl. Ex. A § 10.1.

Stock" is defined to include SBS's common stock and preferred stock.[145] The second part of Section 10.4, found in the third sentence emphasized above, sets forth what the Company must do if it discovers that *any* of its Capital Stock "represented by a Domestic Share Certificate" is held by an alien.

SBS asserts that a "single Domestic Share Certificate" represents *all* of the Series B Preferred Stock[146] and that, when it reviewed plaintiffs' original complaint in this action, "it learned for the first time that certain Plaintiffs purport to be Series B Preferred stockholders and are foreign entities."[147] This prompted SBS to take the action that precipitated the filing of Counts IV and V: SBS suspended all Series B Holders' rights as stockholders "other than [the] right to transfer [] shares to a citizen of the United States."[148] To date, SBS has not issued a Foreign Share Certificate to any of the Series B Holders.

The Company contends it was required under Section 10.4 to cancel the single Domestic Share Certificate representing the Series B Preferred Stock upon learning that some of the Series B Holders are aliens. It further contends that it could not issue any Foreign Share Certificate because: (i) Section 10.4 of the Charter requires

---

[145] Am. Compl. Ex. A § 5.1 ("The Common Stock and the Preferred Stock are sometimes referred to herein as the Capital Stock of the Corporation.").

[146] Def.'s Opening Br. 46; Def.'s Reply Br. 26.

[147] Def.'s Opening Br. 17; *see also* Am. Compl. ¶¶ 14-15, 17, 19-22.

[148] Am. Compl. ¶ 63 (quoting SBS, Current Report (Form 8-K) (Nov. 28, 2017), Ex. 4.1).

that a Foreign Share Certificate be issued in lieu of a canceled Domestic Share Certificate "on a one-for-one basis"; and (ii) if SBS were to issue a single Foreign Share Certificate, the issuance would violate Section 10.2 of the Charter.[149]

Section 10.2—which is entitled "Voting" and to which I refer as the "Voting Provision"—contains a different 25% limitation on alien ownership than the one in Section 10.4.  Specifically, Section 10.2 provides as follows:

> Except as otherwise provided by law, ***not more than twenty-five percent of the aggregate number of shares of Capital Stock of the Corporation outstanding  in any class or series entitled to vote on any matter*** before a meeting of stockholders of the Corporation shall at any time be held for the account of aliens or their representatives or for the account of a foreign government or representative thereof, or for the account of any corporation organized under the laws of a foreign country.[150]

SBS argues that Section 10.2 prohibits alien ownership of more than 25% of the stock in any particular class or series that is entitled to vote on any matter at a stockholder meeting.[151]  According to the Company, the Voting Provision's 25%

---

[149] Def.'s Reply Br. 27.  At oral argument, SBS also argued that if it were to issue a single Foreign Share Certificate to represent all of the Series B Preferred Stock, the issuance would violate Section 10.3 of the Charter.  Tr. 69-70 (Apr. 12, 2018).  Section 10.3 of the Charter mandates that "[s]hares of Capital Stock issued to or held by or for the account of aliens . . . shall be represented by Foreign Share Certificates" and that "[a]ll other shares of Capital Stock shall be represented by Domestic Share Certificates."  Am. Compl. Ex. A § 10.3.

[150] Am. Compl. Ex. A § 10.2 (emphasis added).

[151] Def.'s Reply Br. 28-29.

limitation has been violated because "the present VRTE granted certain voting rights to the Series B Preferred stockholders"[152] (*i.e.*, the right to elect two directors to SBS's board), and aliens hold approximately 69.92% of the outstanding Series B Preferred Stock.[153] The Company further contends that, because it could not issue a single Foreign Share Certificate to replace the single Domestic Share Certificate it canceled because aliens then would have voting rights in excess of the limitation set forth in Section 10.2, the Company was forced to suspend all rights of the Series B Holders other than the right to transfer the Series B Preferred Stock to a citizen of the United States in order to comply with Section 10.4.[154] As a secondary matter, SBS contends that "even if SBS were permitted to replace the canceled Domestic Share Certificate with an issuance of multiple Domestic and Foreign Share Certificates," it could not do so because of a lack of information.[155]

In response, plaintiffs advance essentially three arguments for why SBS's actions breached Article X of the Charter.

---

[152] Def.'s Opening Br. 49 (citing Am. Compl. ¶ 42).

[153] *Id.* at 7.

[154] *See* Am. Compl. Ex. A § 10.4 ("[I]f, and to the extent, [the Foreign Share Certificate issuance] would violate this ARTICLE X, then, the holder of such Capital Stock shall not be entitled to vote, to receive dividends, or to have any other rights with regard to such Capital Stock to such extent, except the right to transfer such Capital Stock to a citizen of the United States.").

[155] Def.'s Reply Br. 27 n.13 (citing Am. Compl. Ex A §§ 10.2, 10.3).

First, they contend Section 10.1 provides that "Article X was designed to ensure compliance with the Communications Act of 1934, and not . . . to do more than that."[156] Plaintiffs thus argue that the clause "[e]xcept as otherwise provided by law"[157] at the beginning of both Sections 10.2 and 10.4 means that those provisions "will be disabled if foreign ownership otherwise complies with the restrictions contained in the Communications Act."[158] According to plaintiffs, because "the Series B Holders have not violated the Communications Act in these circumstances, and any such violations would be cured by the filing of an appropriate petition with the FCC," SBS was not entitled to cancel the Series B Preferred Stock Domestic Share Certificate.[159] More specifically, plaintiffs argue that there has been no violation of the Communications Act because the FCC told SBS that it did not need to take any remedial action while its petition is outstanding.[160]

---

[156] Tr. 95 (Apr. 12, 2018). Section 10.1 states, in relevant part, that "ARTICLE X shall be applicable to the Corporation so long as the provisions of Section 310 of the Communications Act . . . are applicable to the Corporation" and that "[i]f the provisions of Section 310 of the Communications Act . . . are amended, the restrictions in this ARTICLE X shall be amended in the same way, and as so amended, shall apply to the Corporation." Am. Compl. Ex. A § 10.1.

[157] Am. Compl. Ex. A §§ 10.2, 10.4.

[158] Pls.' Answering Br. 42.

[159] *Id.* at 42 n.29.

[160] Tr. 102-03 (Apr. 12, 2018).

46

Second, plaintiffs argue that the Company's interpretation of how to calculate the 25% ownership limitation in the Voting Provision is incorrect. Plaintiffs contend that, properly read, the limitation in Section 10.2 requires SBS to apply the 25% limitation to the "*aggregate*" of all classes and series entitled to vote on any matter before any meeting of stockholders,[161] and that, as a factual matter, "'aliens' never held 'more than twenty-five percent of the *aggregate* shares of Capital Stock.'"[162] In other words, in considering the alien ownership limitation in the Voting Provision, plaintiffs argue that SBS must tally all of the Capital Stock entitled to vote on any matter at a stockholder meeting and then determine whether aliens own more than 25% of that sum, whereas the Company contends that that it must consider each class or series of stock individually.

Third, plaintiffs assert in the alternative that "even if the [25% ownership limitation in the Voting Provision] were applicable such that the Enforcement Provision were triggered, the Enforcement Provision applies—if at all—only 'to the extent' ownership of the Series B Holders violates the Charter."[163] According to plaintiffs, Section 10.4 requires SBS to "analyze the Series B Holder's nationality

---

[161] Pls.' Answering Br. 43-44; Tr. 99-100 (Apr. 12, 2018).

[162] Am. Compl. ¶ 92 (emphasis in original).

[163] Am. Compl. ¶ 71.

47

on an individual basis,"[164] because "Article X does not—and could not—authorize SBS to unilaterally suspend the rights of the holders of an entire class or series of stock on grounds that *certain* members may be foreign holders."[165]

I need not address, and express no opinion on, plaintiffs' first and second arguments because, in my opinion, Count IV clearly states a claim for relief based on plaintiffs' third argument, *i.e.*, that SBS failed to issue new share certificates after canceling the Domestic Share Certificate "to the extent" that compliance with Article X could be maintained. In my view, a reasonable interpretation of the Enforcement Provision is that after canceling a Domestic Share Certificate, the Company had an obligation to issue replacement share certificates to the extent possible up to the alien ownership limitation threshold. Indeed, the Charter plainly contemplates that a class or series of stock would have both domestic and foreign holders. Thus, a reasonable interpretation of the Enforcement Provision is that SBS could issue multiple share certificates in lieu of a single Domestic Share Certificate by issuing new Domestic Share Certificates for those Series B Holders qualified to

---

[164] Am. Compl. ¶ 71.

[165] Pls.' Answering Br. 46-47 (emphasis in original). During oral argument, plaintiffs advanced a fourth argument: SBS only could cancel the Domestic Share Certificate in the first place if it could also issue a replacement Foreign Share Certificate (or multiple ones) in its stead. Plaintiffs base this argument on the language in Section 10.4 that says SBS both "shall" cancel a Domestic Share Certificate and "shall" issue a Foreign Share Certificate upon discovering an alien holds Capital Stock represented by a Domestic Share Certificate. In other words, plaintiffs argue that this provision means "if you can't issue as a result of canceling, you just can't follow that option." Tr. 107-08 (Apr. 12, 2018).

receive them and Foreign Share Certificates to the other Series B Holders up to the alien ownership limitation threshold.

Notwithstanding the foregoing, the Company had not issued *any* replacement certificates, Foreign *or* Domestic, as of oral argument. Thus, it appears that none of the Series B Preferred Stock is represented by a share certificate and none of the Series B Holders has any rights other than to transfer the stock to a U.S. citizen. Indeed, as of oral argument, the Company had not even issued replacement Domestic Share Certificates for those plaintiffs who verified allegations of the Amended Complaint attesting that they are United States citizens.[166]

I reject SBS's contention that the only reasonable interpretation of Section 10.4 is that it "requires that new Certificates be issued in lieu of cancelled Certificates on a one-for-one basis."[167] As an initial matter, this position is at odds with SBS's own public filings referenced in the Amended Complaint and its April 2, 2018 letter to the court, which suggest that SBS (presumably aware of the single Domestic Share Certificate for all the Series B Preferred Stock) planned to issue multiple replacement certificates to the Series B Holders.[168] The clause in Section

---

[166] *See, e.g.*, Am. Compl. ¶¶ 14, 15, 18, 71.

[167] Def.'s Reply Br. 27.

[168] *See* Am. Compl. ¶ 63 n.44 (citing SBS, Current Report (Form 8-K) (Nov. 28, 2017), Ex. 4.1) (emphasis added) ("Consistent with the requirements of Section 10.3 and 10.4 of the Certificate of Incorporation, your shares shall hereafter by represented by '*Foreign*

10.4 on which the Company relies, moreover, appears to be simply illustrative in nature.[169] It does not address the scenario where a single certificate represents multiple underlying holders (domestic and/or foreign), and it seems implausible that this clause was intended to preclude the issuance of multiple certificates to replace a single certificate in that situation given that the Charter plainly contemplates that a class or series of stock would have both domestic and foreign holders.

SBS complains that it does not know the citizenship of the Series B Holders and thus "cannot issue any new certificates without running the risk of erroneously issuing a Foreign Share Certificate to a domestic entity, issuing a Domestic Share Certificate to a foreign entity or issuing a Foreign Share Certificate to an alien that bought shares after the 25% ownership threshold in Section 10.2 of the Charter had been exceeded."[170] Putting aside the fact that this explanation contradicts the Company's "one-for-one basis" argument, it does not negate the viability of Count

_Share Certificates_,' subject to the terms and provisions contained in the Certificate of Incorporation that are applicable to such shares, unless and until the Company subsequently determines that your shares are properly represented by '_Domestic Share Certificates._'"); Letter from R. Saunders, Esq. (Apr. 2, 2018), Ex. 1 (emphasis added) ("[W]hile certain of its Series B Preferred Stock may have been transferred to non-U.S. entities, [SBS] has not yet issued _foreign share certificates_ evidencing such stock.").

[169] The relevant clause states simply that "[i]f it shall be found by the Corporation that Capital Stock represented by a Domestic Share Certificate is, in fact, held by or for the account of aliens . . . then such Domestic Share Certificate shall be canceled and a new certificate representing such Capital Stock marked 'Foreign Share Certificate' shall be issued in lieu thereof." Am. Compl. Ex. A § 10.4.

[170] Def.'s Reply Br. 27 n.13.

IV. Given the severity of depriving stockholders of fundamental rights, it is reasonable to expect that the Company would proceed with alacrity in issuing replacement certificates under Section 10.4. Yet, to repeat, many months had passed since the instant motion was argued without any curative action being taken.

For the reasons explained above, I find that plaintiffs have sufficiently pled facts such that it is reasonably conceivable that SBS breached the Charter by canceling the Domestic Share Certificate, not issuing any replacement share certificates, and indiscriminately suspending the rights of all of the Series B Holders.[171]

### 2. Plaintiffs Have Stated a Claim that Section 10.4 is Invalid as Applied

Count V of the Amended Complaint seeks a declaratory judgment that Section 10.4 of the Charter is invalid on the theory that it impermissibly "purports to permit the suspension of all rights of stockholders of a Delaware corporation."[172] According to plaintiffs, "the broad suspension of rights, in and of itself, is unenforceable facially and as-applied."[173]

---

[171] The elements of a breach of charter claim are the same as a breach of contract claim. *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385-86 (Del. 2012). *See supra* Section III.A.1.

[172] Am. Compl. ¶ 96.

[173] Pls.' Answering Br. 50.

Plaintiffs' claim that Section 10.4 of the Charter is facially invalid must be dismissed. In a facial challenge to the validity of a charter provision, a *plaintiff* has the burden to show that the charter provision "cannot operate lawfully or equitably *under any circumstances*."[174] A plaintiff has this burden because charter provisions are "presumed to be valid, and the courts will construe the [charter provisions] in a manner consistent with the law rather than strike down the [charter provisions]."[175] Here, because plaintiffs have not attempted to explain how Section 10.4 cannot operate lawfully or equitably under any circumstances, their claim that the charter provision is facially invalid shall be dismissed.[176]

I now turn to whether the Enforcement Provision, as applied here, is invalid. The Company argues that Count V should be dismissed under Court of Chancery Rules 12(b)(1) and 12(b)(6) for, respectively, lack of ripeness and the failure to state a claim for relief.

---

[174] *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 948 (Del. Ch. 2013) (citation omitted and emphasis in original) (Strine, C.). *Boilermakers* involved challenges to bylaws, rather than a charter provision, but Delaware courts have held that the legal principles relevant to interpreting a charter provision and a bylaw are identical. *Id.* at 948 n.55.

[175] *Id.* at 948 (citing *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 407 (Del. 1985)).

[176] *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (citation omitted) ("Issues not briefed are deemed waived.").

Ripeness is a threshold issue.[177]  Under 10 *Del. C.* § 6501, Delaware courts only have subject matter jurisdiction over a declaratory judgment action where an "actual controversy" exists between the parties.[178]  An actual controversy requires, among other things, that "the issue involved in the controversy must be ripe for judicial determination."[179]  A controversy is ripe where it has "matured to a point where judicial action is appropriate."[180]  Our Supreme Court has described the relevant analysis as follows:

> A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form.  Generally, a dispute will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static.  Conversely, a dispute will be deemed not ripe where the claim is based on uncertain and contingent events that may not occur, or where future events may obviate the need for judicial intervention.[181]

---

[177] *K&K Screw Prods., L.L.C. v. Emerick Capital Invs., Inc.*, 2011 WL 3505354, *6 (Del. Ch. Aug. 9, 2011).

[178] *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989).

[179] *Id.* at 480 (citation omitted).

[180] *XI Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (citation and internal quotations omitted).

[181] *Id*. at 1217-18 (citations and internal quotations omitted).

Plaintiffs bear the burden of demonstrating that their claims are ripe, and the court may consider documents outside the complaint on a motion to dismiss for lack of subject matter jurisdiction.[182]

SBS argues that Count V is not ripe because plaintiffs "do not allege that any SBS stockholder attempted to exercise [its] rights (or wants to) and was denied" through the operation of Section 10.4 of the Charter.[183]  True enough, plaintiffs alleged in the Amended Complaint merely that "SBS appears to preclude Plaintiffs from exercising statutory inspection rights or bringing actions on behalf of SBS," without pleading that they intended to exercise such rights or attempted to do so but were denied.[184]  In their answering brief and at oral argument, however, plaintiffs represented that one of the them, West Face Long Term Opportunities Global Master L.P., served on SBS a books and records demand under 8 *Del. C.* § 220 on January 22, 2018 to, among other things, investigate West Face's rights and obligations under the Foreign Share Certificates.[185]  The Company apparently rejected this

---

[182] *E.I. du Pont de Nemours & Co. v. Bayer CropScience, L.P.*, 2008 WL 2673376, at *2 (Del. Ch. July 2, 2008).

[183] Def.'s Opening Br. 50.

[184] Am. Compl. ¶ 72.

[185] Pls.' Answering Br. 49 n.43; Tr. 108 (Apr. 12, 2018).

demand on January 26, 2018, stating that West Face lacks standing to assert rights under Section 220.[186]

Although "[a]rguments in briefs do not serve to amend the pleadings,"[187] the court may, as noted above, look outside of the pleadings to determine whether it has jurisdiction.[188] Items that the court may consider include "the pleadings, proxy statements, affidavits, and briefs of the parties."[189] Here, plaintiffs have represented that one of them attempted to exercise its inspection rights but was rebuffed by SBS. SBS does not deny that this occurred. Accordingly, plaintiffs have a ripe claim with respect to Count V.

Count V also states a claim upon which relief can be granted in my opinion. A court will "only invalidate a certificate provision if it 'transgress[es]'—i.e., vitiates or contravenes—a mandatory rule of our corporate code or common law."[190] "A stockholder's rights under [S]ection 220 cannot be eliminated or limited by a provision in a corporation's certificate of incorporation."[191] "By default, 'all stock

---

[186] Pls.' Answering Br. 49 n.43.

[187] *In re MeadWestvaco Stockholder Litig.*, 168 A.3d 675, 688 n.68 (Del. Ch. 2017) (citation and internal quotations omitted).

[188] *Sloan v. Segal*, 2008 WL 81513, at *6 (Del. Ch. Jan. 3, 2008) (Strine, V.C.).

[189] *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 974 (Del. Ch. 2000).

[190] *Jones Apparel Grp., Inc. v. Maxwell Shoe Co., Inc.*, 883 A.2d 837, 846 (Del. Ch. 2004) (Strine, V.C.) (citing *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 118 (Del. 1952)).

[191] 2 EDWARD P. WELCH ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 220.01, at 7-203 (6th ed. Supp. 2018) (citing *Marmon v. Arbinet-Thexchange, Inc.*, 2004

is created equal,'"[192] so "all classes of stock enjoy the same rights and privileges unless an affirmative expression alters those rights."[193]  If a certificate of incorporation or a certificate of designations "is silent on a particular issue, then as to that issue the preferred stock and the common stock have the same rights,"[194] *i.e.*, the "default rights remain unaltered."[195]

As noted above, "[a]ny rights, preferences and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated,

---

WL 936512, at *5 n.12 (Del. Ch. Apr. 28, 2004)).  In *Marmon*, the court explained that a "charter provision that conflicts with a statute is void," so a charter provision "is void to the extent that it abridges or limits shareholder inspection rights."  2004 WL 936512, at *5 n.12.

[192] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 39 (Del. Ch. 2013) (citing *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *6 (Del. Ch. May 5, 2010)).

[193] *MCG Capital*, 2010 WL 1782271, at *6 (citing *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 593-94 (Del. Ch. 1986) (Allen, C.)); *see* 8 *Del. C.* § 151(a) ("Every corporation may issue 1 or more classes of stock or 1 or more series of stock within any class thereof, . . . and which classes or series may have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the certificate of incorporation or of any amendment thereto.").

[194] *In re Trados*, 73 A.3d at 39 (citation omitted).

[195] *MCG Capital Corp.*, 2010 WL 1782271, at *6 (citing *Jedwab*, 509 A.2d at 953-54 (emphasis in original) ("If a certificate designating rights, preferences, etc. of special stock contains *no* provision dealing with voting rights or *no* provision creating rights upon liquidation, it is not the fact that such stock has no voting rights or no rights upon liquidation. Rather, in such circumstances, the preferred stock has the same voting rights as common stock . . . or the same rights to participate in the liquidation of the corporation.")).

as provided by statute,"[196] because "stock preferences are in derogation of the common law."[197] Here, however, SBS does not point to any alteration, limitation, or elimination in the Certificate of the Series B Holders' right to inspect SBS's books and records under 8 *Del. C.* § 220. As such, the Series B Holders have the right to inspect SBS's books and records under Section 220, a right that SBS cannot limit or restrict in the Charter. Despite the existence of this right, the Company allegedly rejected West Face's demand because it "lacks standing to assert rights under Section 220."[198] Accordingly, plaintiffs' as-applied challenge to the validity of the Enforcement Provision states a claim, because it is reasonably conceivable that SBS used Section 10.4 to deny West Face's inspection rights impermissibly.

## IV. CONCLUSION

For the reasons explained above, SBS's motion to dismiss is granted in part and denied in part. The parties are directed to confer and to submit an implementing order in accordance with this opinion within five business days.

**IT IS SO ORDERED.**

---

[196] *Elliot Assocs.*, 715 A.2d at 852 (citing 8 *Del. C.* § 151(a)).

[197] *Waggoner*, 581 A.2d at 1134 (citation omitted).

[198] Pls.' Answering Br. 49 n.34.